# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and STATE FARM FIRE AND CASUALTY COMPANY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| MICHAEL THOMAS LAROCCA, D.C., BLAKE THOMAS LAROCCA, MICHAEL AUGUST MAJOR, D.C., JASON EDWARD HUNT, D.C., JEFFREY EDUARD RAHEB, D.C., ANTOINETTE DENISE STEWART, D.C., RUTH GERMAINE GRIFFIN, D.C., SAVANNAH JANE MAYBERRY, D.C., MOUNIR SEMIA, D.C., TOBIAS BACANER, M.D., CECILIO TORRES-RUIZ, M.D., LORI REBEIN, NP-C, ALL ACCIDENTS CHIROPRACTIC CENTER, PLLC, LAROCCA CHIROPRACTIC CENTERS, LLC, LAROCCA CHIROPRACTIC INJURY CENTER, LLC, LAROCCA INJURY CENTERS LLC, and LAROCCA AUTO INJURY CENTER LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DEMAND FOR A JURY TRIAL** |
| Defendants. | | |

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire"), for their Complaint against Michael Thomas LaRocca, D.C. ("Michael LaRocca"), Blake Thomas LaRocca ("Blake LaRocca"), Michael August Major, D.C. ("Major"), Jason Edward Hunt, D.C. ("Hunt"), Jeffrey Eduard Raheb, D.C. ("Raheb"), Antoinette Denise Stewart, D.C. ("Stewart"), Ruth Germaine Griffin, D.C. ("Griffin"), Savannah Jane Mayberry, D.C. ("Mayberry"), Mounir Semia, D.C. ("Semia"), Tobias Bacaner, M.D. ("Bacaner"), Cecilio Torres-Ruiz, M.D. ("Torres-Ruiz"), Lori Rebein, NP-C ("Rebein"), All Accidents Chiropractic Center, PLLC ("All Accidents Chiropractic"), LaRocca Chiropractic Centers, LLC ("LaRocca Chiropractic Centers"), LaRocca Chiropractic Injury Center LLC ("LaRocca Chiropractic Injury Center"), LaRocca Injury Centers LLC ("LaRocca Injury Centers"), and LaRocca Auto Injury Center LLC ("LaRocca Auto Injury") (collectively, "Defendants"), allege as follows:

## I.      NATURE OF THE CASE

1.      This action involves a fraud scheme in which Defendants act in concert to collect benefits under Personal Injury Protection policies ("PIP Benefits") and Medical Payments Coverage policies ("MPC Benefits") (collectively, "No-Fault Benefits") from State Farm Mutual and State Farm Fire by submitting claims for chiropractic and medical services purportedly provided to

patients involved in auto accidents and eligible for No-Fault Benefits under State Farm Mutual and State Farm Fire insurance policies when, in fact, such services are not medically necessary and not lawfully rendered. Instead, the services are performed pursuant to a predetermined treatment protocol (the "Predetermined Protocol") designed and carried out to enrich Defendants by exploiting patients' eligibility for No-Fault Benefits, and not to address the unique circumstances and medical needs of any individual patient.

2. The Predetermined Protocol, which is implemented and carried out by Michael LaRocca, Blake LaRocca, Major, Hunt, Raheb, Stewart, Griffin, Mayberry, Semia, Bacaner, Torres-Ruiz, and Rebein at All Accidents Chiropractic, LaRocca Auto Injury, LaRocca Chiropractic Centers, LaRocca Chiropractic Injury Center, and LaRocca Injury Centers (collectively, the "LaRocca Clinics"), includes: (a) initial examinations by Michael LaRocca, Major, Hunt, Raheb, Stewart, Griffin, Mayberry, Semia, and other chiropractors employed by the LaRocca Clinics (the "LaRocca Chiropractors") resulting in records documenting the same or similar nonspecific complaints and examination findings, which in turn purportedly justify a predetermined and medically unnecessary course of treatment at the LaRocca Clinics; (b) a predetermined and medically unnecessary course of treatment that consists of the same or substantially similar combination of at least three passive modalities and one active treatment provided to patients on almost

every visit, regardless of patients' unique circumstances and needs; (c) initial medical examinations by Bacaner, Torres-Ruiz, and Rebein that are performed to confirm patients are injured, attribute those injuries solely to their auto accidents, and support the alleged need for the predetermined course of care at the LaRocca Clinics by falsely documenting nearly all patients have sustained emergency medical conditions ("EMCs") as a result of their accident; (d) after Defendants exploit patients' No-Fault Benefits, final medical examinations by Bacaner, Torres-Ruiz, and Rebein that are performed to confirm virtually all patients (i) continue to suffer pain from their auto accidents, despite purportedly receiving extensive treatments at the LaRocca Clinics, (ii) are permanently injured, and (iii) continue to need further treatment which, in turn, can be used to support the statutory threshold for patients' bodily injury claims ("BI Claims") against at-fault drivers for non-economic damages, including pain and suffering, and economic damages above and beyond their No-Fault Benefits, as well as uninsured/underinsured motorist claims ("UM Claims") against their own insurance companies if recovery from at-fault drivers is not sufficient to compensate them for their economic and non-economic damages; and (e) medically unnecessary diagnostic imaging, including x-rays and DXD Cervical Radiographic Spinal Analyses ("DXD Studies"), performed by the LaRocca Chiropractors to support the purported need for the predetermined course of treatment at the LaRocca Clinics.

3.     Defendants act in concert to submit, or cause to be submitted, bills and supporting documentation to State Farm Mutual and State Farm Fire falsely representing services purportedly rendered to patients are legitimate and medically necessary when, in fact, they are not because they are performed, if at all, pursuant to the Predetermined Protocol to exploit patients' No-Fault Benefits and to support the statutory threshold for patients to make BI Claims and UM Claims.    Defendants' bills and supporting documentation for services rendered pursuant to the Predetermined Protocol, described, in part, in the appendices attached hereto as Exhibits 1-10, are fraudulent and the charges for those services are not owed because they are not medically necessary and not lawfully rendered.

4.     Because of Defendants' fraudulent scheme: (a) patients are not legitimately examined, diagnosed, or treated for conditions they may have; (b) patients are subjected to medically unnecessary services, regardless of their unique needs; (c) patients' limited No-Fault Benefits are exploited and therefore not available for medically necessary treatment they may need; and (d) personal injury attorneys ("PI Attorneys") use Defendants' fraudulent bills and supporting documentation to present inflated BI Claims against at-fault drivers and UM Claims against State Farm Mutual and State Farm Fire.

5.     Defendants' fraudulent scheme began at least as early as January 2017 and has continued uninterrupted since that time.    As a direct and proximate result

of the scheme, State Farm Mutual and State Farm Fire have incurred actual damages of at least $2.1 million in No-Fault Benefits paid to Defendants.

6. Defendants made material misrepresentations and have taken other affirmative acts to conceal their fraud from State Farm Mutual and State Farm Fire. Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent and unlawful nature. Only when Defendants' bills and supporting documentation across all patients at issue in this Complaint are viewed together as a whole do the patterns emerge revealing their fraudulent nature.

7. Each Defendant agreed to act and did act in furtherance of the common and overall objective of the conspiracy to defraud State Farm Mutual and State Farm Fire through the fraudulent claims described throughout this Complaint. Specifically: (a) Michael LaRocca, Blake LaRocca, and potentially others designed, oversaw, and are responsible for the Predetermined Protocol to exploit No-Fault Benefits of patients who treat at the LaRocca Clinics; (b) Blake LaRocca, the LaRocca Chiropractors, Bacaner, Torres-Ruiz, and Rebein submitted, or caused to be submitted, bills and supporting documentation to State Farm Mutual and State Farm Fire that were fraudulent because they were for examinations, treatments, and diagnostic imaging services that were not medically necessary and not lawfully rendered; and (c) Blake LaRocca, in addition to designing, overseeing, and being responsible for the Predetermined Protocol,

managed the LaRocca Clinics, provided billing services for them, and coordinated the submission of bills and other documentation to State Farm Mutual and State Farm Fire that were fraudulent.

8.      This action asserts common law claims for fraud, civil conspiracy, and unjust enrichment, and a statutory claim under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ("FDUTPA"), to recover actual damages of at least $2.1 million paid to Defendants, as well as reasonable attorney's fees and costs for violations of FDUTPA, and any other relief that is just and proper.  Pursuant to 28 U.S.C. § 2201, this action also seeks a declaratory judgment that State Farm Mutual and State Farm Fire are not liable for any unpaid charges the LaRocca Clinics have submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire through the date of this Complaint and the trial of this case, based upon the conduct described above and throughout this Complaint.

## II.      JURISDICTION AND VENUE

9.      Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

10.      Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in this district because Defendants reside in Florida.  Venue is also proper in this district under

7

28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III. PARTIES

### A. Plaintiffs

11.    State Farm Mutual is a citizen of the state of Illinois.  It is incorporated under the laws of the state of Illinois, with its principal place of business in Bloomington, Illinois.  At all relevant times, it has been licensed in Florida to engage in the business of insurance.

12.    State Farm Fire is a citizen of the state of Illinois.  It is incorporated under the laws of the state of Illinois, with its principal place of business in Bloomington, Illinois.  At all relevant times, it has been licensed in Florida to engage in the business of insurance.

### B. Defendants

#### 1. <u>Individual Defendants</u>

##### a. Michael LaRocca

13.    Michael LaRocca is a citizen and resident of Florida and has been licensed to practice chiropractic medicine in Florida since 1976.

14.    Michael LaRocca formed the first LaRocca Clinic, All Accidents Chiropractic, in 2010.  Since January 2017, the LaRocca Clinics have operated at over 12 locations.

15.     In applications for certificates of exemption from licensure filed with the Agency for Health Care Administration ("AHCA") on August 29, 2019, Michael LaRocca represented he owns 100% of All Accidents Chiropractic and LaRocca Chiropractic Centers, and 50% of LaRocca Chiropractic Injury Center and LaRocca Auto Injury Center. On information and belief, Michael LaRocca also owns, in whole or part, LaRocca Injury Centers. Michael LaRocca is the sole member of All Accidents Chiropractic, LaRocca Chiropractic Centers, and LaRocca Injury Centers. Michael LaRocca is also a member of LaRocca Chiropractic Injury Center and LaRocca Auto Injury Center with Major and Hunt, respectively.

16.     In applications for certificates of exemption from licensure filed with the AHCA on August 29, 2019 for All Accidents Chiropractic, LaRocca Chiropractic Centers, LaRocca Chiropractic Injury Center, and LaRocca Auto Injury Center, Michael LaRocca represented that he supervises the business activities of these entities and is legally responsible for each entity's compliance with all federal and state laws. (*See* Fla. Stat. § 400.9905(4)(g).)

17.     From approximately January 2017 to the present, Michael LaRocca has worked at the LaRocca Clinics where he implements the Predetermined Protocol by providing chiropractic examinations, including those identified on Exhibit 2, chiropractic treatments, and diagnostic imaging services, including

those identified on Exhibit 7, to patients that were not legitimate and were not provided to address the patients' unique needs.

18.     From approximately January 2017 to the present, Michael LaRocca has knowingly directed, overseen, and profited from the activities of those who have been employed by or associated with the LaRocca Clinics to provide medically unnecessary and unlawful services pursuant to the Predetermined Protocol.  During at least that period, Michael LaRocca has also knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation to State Farm Mutual and State Farm Fire for services, including examinations, chiropractic treatments, and diagnostic imaging, performed pursuant to the Predetermined Protocol at the LaRocca Clinics.

### b.     Blake LaRocca

19.     Blake LaRocca is a citizen and resident of Florida.

20.     Blake LaRocca is the registered agent for All Accidents Chiropractic, LaRocca Auto Injury, and LaRocca Chiropractic Injury Center, and, until about 2021, was the registered agent for LaRocca Injury Centers.

21.     Blake LaRocca has played and continues to play a significant role operating, directing, and overseeing the LaRocca Clinics.  His father, Michael LaRocca, testified Blake LaRocca is the office manager of the LaRocca Clinics.  (Ex. 11, p. 36.)  On February 1, 2018, Blake LaRocca confirmed he manages the LaRocca

Clinics.  (Ex. 12, p. 3.)  On February 25, 2020, during a deposition in which he served as the corporate representative of LaRocca Chiropractic Centers and LaRocca Injury Centers, Blake LaRocca testified he is in charge of billing for the LaRocca Clinics.  (Ex. 13, p. 7, 10, 41.)  He also testified he performs advertising and marketing on behalf of the LaRocca Clinics by communicating with "general practitioners" and "go[ing] after physicians that don't do auto accidents."  (*Id.* at p. 39.)  In addition to managing, being in charge of billing, and performing advertising and marketing on behalf of the LaRocca Clinics, Blake LaRocca does "coding" and "recordkeeping" for the LaRocca Clinics.  (Ex. 14, p. 9.)

22.    From approximately January 2017 to the present, Blake LaRocca has worked at the LaRocca Clinics where he oversees and implements the Predetermined Protocol by managing the LaRocca Clinics and knowingly submitting, or causing to be submitted, fraudulent bills and supporting documentation to State Farm Mutual and State Farm Fire for services, including examinations, chiropractic treatments, and diagnostic imaging, performed pursuant to the Predetermined Protocol.

23.    As described in greater detail below (Section VI), in 2014, Blake LaRocca formed BTL Funding "L.L.C." ("BTL Funding") from which he additionally profits from Defendants' fraudulent scheme.  Blake LaRocca uses BTL Funding to earn additional profits by purchasing accounts receivable for patients

who treat at the LaRocca Clinics and undergo procedures at surgery centers performed by physicians and other providers. Blake LaRocca has also used another funding company, Greenway Funding L.L.C., to purchase accounts receivable for patients who treat at the LaRocca Clinics and undergo procedures at surgery centers.

24. By purchasing accounts receivable relating to patients who treat at the LaRocca Clinics where Blake LaRocca manages the day-to-day operations and is in charge of the billing, coding, and recordkeeping, Blake LaRocca has an incentive to implement—and does implement—the Predetermined Protocol to paper patients' records at the LaRocca Clinics with continued complaints of pain and unresolved and permanent injuries that purportedly require additional treatment and referrals to pain management providers to perform procedures Blake LaRocca can profit from by purchasing the accounts receivable.

### c.    Major

25. Major is a citizen and resident of Florida and has been licensed to practice chiropractic medicine in Florida since 1994.

26. Major and Michael LaRocca formed LaRocca Chiropractic Injury Center in 2011. In an application for certificate of exemption from licensure filed with AHCA on August 29, 2019, Major represented he holds a 50% ownership

interest in LaRocca Chiropractic Injury Center. Major and Michael LaRocca are the members of LaRocca Chiropractic Injury Center.

27. In that application, Major also represented that he supervises the business activities of LaRocca Chiropractic Injury Center and is legally responsible for its compliance with all federal and state laws. (*See* Fla. Stat. § 400.9905(4)(g).)

28. From approximately January 2017 to the present, Major has worked at the LaRocca Clinics where he implements the Predetermined Protocol by providing chiropractic examinations, including those identified on Exhibit 3, treatments, and diagnostic imaging services, including those identified on Exhibit 7, to patients that were not legitimate and were not provided to address patients' unique needs.

29. From approximately January 2017 to the present, Major has knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation from the LaRocca Clinics for services, including examinations, chiropractic treatments, and diagnostic imaging, performed pursuant to the Predetermined Protocol.

### d. Hunt

30. Hunt is a citizen and resident of Florida and has been licensed to practice chiropractic medicine in Florida since 2016.

31.     Hunt and Michael LaRocca formed LaRocca Auto Injury Center in 2011.  In an application for certificate of exemption from licensure filed with AHCA on August 29, 2019, Hunt represented he holds a 50% ownership interest in LaRocca Auto Injury Center.  Hunt and Michael LaRocca are the members of LaRocca Auto Injury Center.

32.     In that application, Hunt also represented that he supervises the business activities of LaRocca Auto Injury Center and is legally responsible for its compliance with all federal and state laws.  (*See* Fla. Stat. § 400.9905(4)(g).)

33.     From approximately January 2017 to the present, Hunt has worked at the LaRocca Clinics where he implements the Predetermined Protocol by providing chiropractic examinations, including those identified on Exhibits 2 and 3, chiropractic treatments, and diagnostic imaging services to patients that were not legitimate and were not provided to address the patients' unique needs.

34.     From approximately January 2017 to the present, Hunt has knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation from the LaRocca Clinics for services, including examinations, chiropractic treatments, and diagnostic imaging, performed pursuant to the Predetermined Protocol.

### e.    Raheb

35.    Raheb is a citizen and resident of Florida and has been licensed to practice chiropractic medicine in Florida since 2000.

36.    From at least January 2017 to July 2017, Raheb and Michael LaRocca each held a 50% ownership interest in All Accidents Chiropractic.  According to documents submitted to AHCA, on July 1, 2017, Raheb agreed to relinquish his 50% ownership in All Accidents Chiropractic for a one-time payment of $25,000 made by Michael LaRocca.  (Ex. 15.)

37.    On information and belief, from approximately January 2017 to at least July 2017, Raheb worked at the LaRocca Clinics where he implemented the Predetermined Protocol by providing chiropractic examinations, treatments, and diagnostic imaging services to patients that were not legitimate and were not provided to address the patients' unique needs.

38.    On information and belief, from approximately January 2017 to at least July 2017, Raheb knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation from the LaRocca Clinics for services, including examinations, chiropractic treatments, and diagnostic imaging, performed pursuant to the Predetermined Protocol.

### f.    Stewart

39.    Stewart is a citizen and resident of Florida and has been licensed to practice chiropractic medicine in Florida since 2016.

40.    From approximately February 2017 to the present, Stewart has worked at the LaRocca Clinics where she implements the Predetermined Protocol by providing chiropractic examinations, including those identified on Exhibit 2, treatments, and diagnostic imaging services to patients that were not legitimate and were not provided to address patients' unique needs.

41.    From approximately February 2017 to the present, Stewart has knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation from the LaRocca Clinics for services, including examinations, chiropractic treatments, and diagnostic imaging, performed pursuant to the Predetermined Protocol.

### g.    Griffin

42.    Griffin is a citizen and resident of Florida and has been licensed to practice chiropractic medicine in Florida since 2014.

43.    From approximately January 2017 to the present, Griffin has worked at the LaRocca Clinics where she implements the Predetermined Protocol by providing chiropractic examinations, including those identified on Exhibit 2,

treatments, and diagnostic imaging services to patients that were not legitimate and were not provided to address patients' unique needs.

44. From approximately January 2017 to the present, Griffin has knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation from the LaRocca Clinics for services, including examinations, chiropractic treatments, and diagnostic imaging, performed pursuant to the Predetermined Protocol.

### h. Mayberry

45. Mayberry is a citizen and resident of Florida and has been licensed to practice chiropractic medicine in Florida since 2017.

46. From approximately March 2018 to the present, Mayberry has worked at the LaRocca Clinics where she implements the Predetermined Protocol by providing chiropractic examinations, including those identified on Exhibit 2, treatments, and diagnostic imaging services to patients that were not legitimate and were not provided to address patients' unique needs.

47. From approximately March 2018 to the present, Mayberry has knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation from the LaRocca Clinics for services, including examinations, chiropractic treatments, and diagnostic imaging, performed pursuant to the Predetermined Protocol.

### i. Semia

48.     Semia is a citizen and resident of Florida and has been licensed to practice chiropractic medicine in Florida since 2017.

49.     From approximately February 2018 to the present, Semia has worked at the LaRocca Clinics where she implements the Predetermined Protocol by providing chiropractic examinations, including those identified on Exhibits 2 and 3, treatments, and diagnostic imaging services to patients that were not legitimate and were not provided to address patients' unique needs.

50.     From approximately February 2018 to the present, Semia has knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation from the LaRocca Clinics for services, including examinations, chiropractic treatments, and diagnostic imaging, performed pursuant to the Predetermined Protocol.

### j. Bacaner

51.     Bacaner is a citizen and resident of Florida and has been licensed to practice medicine in Florida since 1990.

52.     From approximately January 2017 to at least August 2018, Bacaner worked at the LaRocca Clinics where he implemented the Predetermined Protocol by providing medical examinations, including those identified on Exhibits 4 and

8, that were not legitimate and were not provided to address patients' unique needs.

53.     From approximately January 2017 to at least August 2018, Bacaner knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation from the LaRocca Clinics for services, including medical examinations, performed pursuant to the Predetermined Protocol.

### k.     Torres-Ruiz

54.     Torres-Ruiz is a citizen and resident of Florida and has been licensed to practice medicine in Florida since 1995.

55.     From approximately January 2017 to the present, Torres-Ruiz has worked at the LaRocca Clinics where he implements the Predetermined Protocol by providing medical examinations, including those identified on Exhibits 5 and 9, that were not legitimate and were not provided to address patients' unique needs.

56.     From approximately January 2017 to the present, Torres-Ruiz has knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation from the LaRocca Clinics for services, including medical examinations, performed pursuant to the Predetermined Protocol.

### 1.     Rebein

57.     Rebein is a citizen and resident of Florida and has been licensed as a certified nurse practitioner in Florida since 2018.

58.     From approximately January 2017 to the present, Rebein has worked at the LaRocca Clinics where she implements the Predetermined Protocol by assisting in providing or providing medical examinations, including those identified on Exhibits 6 and 10, that were not legitimate and were not provided to address patients' unique needs.

59.     From approximately January 2017 to the present, Rebein has knowingly submitted, or caused to be submitted, fraudulent bills and supporting documentation from the LaRocca Clinics for services, including medical examinations, performed pursuant to the Predetermined Protocol.

### 2.     The LaRocca Clinics

#### a.     All Accidents Chiropractic

60.     All Accidents Chiropractic is an active Florida professional limited liability company that provides treatment primarily, if not exclusively, to individuals involved in automobile accidents.  Its principal place of business is at 3301 5th Avenue South, St. Petersburg, Florida 33712.  Michael LaRocca is the sole member of All Accidents Chiropractic.

61.     Michael LaRocca formed All Accidents Chiropractic on February 5, 2010.  According to an application for certificate of exemption from licensure filed with AHCA on August 29, 2019, Michael LaRocca holds a 100% ownership interest in All Accidents Chiropractic.

62.     According to the entity's 2021 Annual Report filed with the Florida Department of State, Michael LaRocca is the manager of All Accidents Chiropractic and Blake LaRocca is its registered agent.

63.     At all relevant times, All Accidents Chiropractic has operated as a "clinic"[1] as that term is defined in Fla. Stat. § 400.9905(4).   All Accidents Chiropractic is an unlicensed clinic that obtained a certificate of exemption  from licensure from AHCA on September 11, 2019 pursuant to Fla. Stat. § 400.9905(4)(g). Prior to that date, All Accidents Chiropractic operated as a wholly-owned exempt clinic.

64.     From at least January 2017 through the present, All Accidents Chiropractic has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully

---

[1] Pursuant to Fla. Stat. § 400.9905(4), a "clinic" is defined as "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services[.]"

rendered.  The appendix attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to All Accidents Chiropractic's patients pursuant to the Predetermined Protocol.[2]

### b.     LaRocca Chiropractic Centers

65.     LaRocca Chiropractic Centers is an active Florida limited liability company that provides treatment primarily, if not exclusively, to individuals involved in automobile accidents.  Its principal place of business is at 2017 Drew Street, Clearwater, Florida 33765.  Michael LaRocca is the sole member of LaRocca Chiropractic Centers.

66.     LaRocca Chiropractic Centers was formed on July 19, 2010 with Michael LaRocca serving as its manager.  According to an application for certificate of exemption from licensure filed with AHCA on August 29, 2019, Michael LaRocca holds a 100% ownership interest in LaRocca Chiropractic Centers.

---

[2] Exhibit 1 identifies: (1) patients' claim number (col. B); (2) patients' initials (col. C); (3) the date of patients' auto accidents (col. D); (4) whether Defendants submitted claims to State Farm Mutual or State Farm Fire (col. E); (5) the patient's age on his or her first visit to the LaRocca Clinics (col. F); (6) patients' first and last dates of service at the LaRocca Clinics (cols. G-H); (7) the location(s) of the LaRocca Clinics where the patient allegedly received services (col. I); (8) patients' total number of visits to the LaRocca Clinics, which typically includes one or more dates of service on which the patient receives no treatment modalities, that were billed to State Farm Mutual and State Farm Fire (col. J); (9) the medically unnecessary and unlawful services the LaRocca Providers rendered to patients pursuant to the predetermined course of treatment, including manual therapy, chiropractic manipulations, cold laser, traction, exercise, TENS units, evaluations, and x-rays (cols. K-T); and (10) the total amounts of fraudulent bills the LaRocca Clinics submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire for each patient's treatment (col. U).

67.     According to the entity's 2021 Annual Report filed with the Florida Department of State, Michael LaRocca is the manager and resident agent of LaRocca Chiropractic Centers.

68.     At all relevant times, LaRocca Chiropractic Centers has operated as a "clinic" as that term is defined in Fla. Stat. § 400.9905(4).  LaRocca Chiropractic Centers is an unlicensed clinic that obtained a certificate of exemption from licensure from AHCA on September 11, 2019 pursuant to Fla. Stat. § 400.9905(4)(g). Prior to that date, LaRocca Chiropractic Centers operated as a wholly-owned exempt clinic.

69.     From at least January 2017 through the present, LaRocca Chiropractic Centers has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered. The appendix attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to LaRocca Chiropractic Centers' patients pursuant to the Predetermined Protocol.

### c.     LaRocca Chiropractic Injury Center

70.     LaRocca Chiropractic Injury Center is an active Florida limited liability company that provides treatment primarily, if not exclusively, to

individuals involved in automobile accidents. According to the entity's most recent Annual Report filed with the Florida Department of State, its principal place of business is at 11401 North 56 Street, Suite 18, Temple Terrace, Florida 33617. Michael LaRocca and Major are the members of LaRocca Chiropractic Injury Center.

71.     LaRocca Chiropractic Injury Center was formed on May 9, 2011 with Michael LaRocca and Major serving as its managers. According to an application for certificate of exemption from licensure filed with AHCA on August 29, 2019, Michael LaRocca and Major each hold 50% ownership interests in LaRocca Chiropractic Injury Centers.

72.     According to the entity's 2021 Annual Report filed with the Florida Department of State, Michael LaRocca and Major are the managers of LaRocca Chiropractic Injury Center and Blake LaRocca is its registered agent.

73.     At all relevant times, LaRocca Chiropractic Injury Center has operated as a "clinic" as that term is defined in Fla. Stat. § 400.9905(4). LaRocca Chiropractic Injury Center is an unlicensed clinic that obtained a certificate of exemption from licensure from AHCA on September 11, 2019 pursuant to Fla. Stat. § 400.9905(4)(g). Prior to that date, LaRocca Chiropractic Injury Center operated as a wholly-owned exempt clinic.

74.     From at least January 2017 through the present, LaRocca Chiropractic Injury Center has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered.  The appendix attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to LaRocca Chiropractic Injury Center's patients pursuant to the Predetermined Protocol.

### d.     LaRocca Injury Centers

75.     LaRocca Injury Centers is an active Florida limited liability company that provides treatment primarily, if not exclusively, to individuals involved in automobile accidents.  Its principal place of business is at 2017 Drew St., Clearwater, Florida 33765.  Michael LaRocca is the sole member of LaRocca Injury Centers.

76.     LaRocca Injury Centers was formed on June 28, 2011 with Michael LaRocca serving as its manager.  On information and belief, LaRocca Injury Centers operates as a wholly-owned exempt clinic and is owned, in whole or part, by Michael LaRocca.

77. According to the entity's 2021 Annual Report filed with the Florida Department of State, Michael LaRocca is the manager and resident agent of LaRocca Injury Centers. Previously, Blake LaRocca served as its registered agent.

78. From at least January 2017 through the present, LaRocca Injury Centers has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered. The appendix attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to LaRocca Injury Centers' patients pursuant to the Predetermined Protocol.

### e. LaRocca Auto Injury Center

79. LaRocca Auto Injury Center is an active Florida limited liability company that provides treatment primarily, if not exclusively, to individuals involved in automobile accidents. According to its most recent Annual Report filed with the Florida Department of State, LaRocca Auto Injury Center's principal place of business is at 2718 Letap Ct., Land O Lakes, Florida 34638. Michael LaRocca and Hunt are the members of LaRocca Auto Injury Center.

80. LaRocca Auto Injury Center was formed on June 20, 2017 with Michael LaRocca and Hunt serving as its managers. According to an application

for certificate of exemption from licensure filed with AHCA on August 29, 2019, Michael LaRocca and Hunt each hold 50% ownership interests in LaRocca Auto Injury Center.

81.     According to the entity's 2021 Annual Report filed with the Florida Department of State, Michael LaRocca and Hunt are the managers of LaRocca Auto Injury Center and Blake LaRocca is its registered agent.

82.     At all relevant times, LaRocca Auto Injury Center has operated as a "clinic" as that term is defined in Fla. Stat. § 400.9905(4).  LaRocca Auto Injury Center is an unlicensed clinic that obtained a certificate of exemption from licensure from AHCA on September 11, 2019 pursuant to Fla. Stat. § 400.9905(4)(g). Prior to that date, LaRocca Auto Injury Center operated as a wholly-owned exempt clinic.

83.     From at least January 2017 through the present, LaRocca Auto Injury Center has knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent services were medically necessary and lawfully rendered when, in fact, they were not medically necessary and were not lawfully rendered. The appendix attached hereto as Exhibit 1 summarizes the medically unnecessary and unlawful services provided to LaRocca Auto Injury Center's patients pursuant to the Predetermined Protocol.

## IV.   ALLEGATIONS COMMON TO ALL CLAIMS

### A.   Insurance Benefits Under Florida Law

84.     According to Florida's PIP statute, Fla. Stat. § 627.736 ("PIP Law"), auto insurers are required to provide PIP Benefits to a limit of $10,000 to certain designated individuals ("Insureds"), for losses resulting from injuries arising out of the ownership, maintenance, or use of a motor vehicle.   Insureds may also purchase MPC Benefits, which may cover additional amounts after their PIP Benefits are exhausted.

85.     For purposes of PIP Benefits, insurers are required to pay 80% of all reasonable expenses for medically necessary medical, surgical, x-ray, dental, and rehabilitative services related to such injuries.  (Fla. Stat. § 627.736(1)(a).)

86.     Under Florida law, "'[m]edically necessary' refers to a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is: (a) [i]n accordance with generally accepted standards of medical practice; (b) [c]linically appropriate in terms of type, frequency, extent, site, and duration; and (c) [n]ot primarily for the convenience of the patient, physician, or other health care provider."  (Fla. Stat. § 627.732(2)(a)-(c).)

87.     Before January 1, 2013, injured parties who were eligible for PIP Benefits were entitled to up to $10,000 of PIP Benefits for medically necessary

goods and services. However, after an amendment to the PIP Law that became effective on January 1, 2013, PIP Benefits are now limited to $2,500 unless a physician or other professional licensed under other specific provisions of Florida law determines the injured person sustained an EMC, in which case the injured person becomes eligible for PIP Benefits of up to $10,000. (Fla. Stat. § 627.736(1)(a)(3)-(4).) Florida law defines an EMC as "a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) [s]erious jeopardy to patient health[;] (b) [s]erious impairment of bodily functions[; or] (c) [s]erious dysfunction of any bodily organ or part." (Fla. Stat. § 627.732(16).)

88. State Farm Mutual and State Farm Fire are required to pay or deny claims for PIP Benefits within 30 days and may be ordered to pay interest and attorneys' fees if they fail to pay the full amount owed within that time period. (Fla. Stat. § 627.736(4)(b) and (d).)

89. However, neither an insurer nor an insured is required to pay a claim or charge: (a) "[f]or any service or treatment that was not lawful at the time rendered;" or (b) "[t]o any person who knowingly submits a false or misleading statement relating to the claim or charges." (Fla. Stat. § 627.736(5)(b)(1)(b)-(c).) Pursuant to Fla. Stat. § 627.732(11), "'[l]awful' or 'lawfully' means in substantial

compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." "'Knowingly' means that a person, with respect to information, has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the information, and proof of specific intent to defraud is not required." (Fla. Stat. § 627.732(10).)

**B.    Tort Claims For Non-Economic Loss**

90.    Individuals who are not at fault for causing an auto accident can also potentially recover damages: (a) from at-fault drivers or their insurers through a BI Claim; and/or (b) through a UM Claim from the individuals' own insurers if recovery under the BI Claim is insufficient. The benefits potentially available to patients through BI and UM Claims include pain and suffering and other forms of non-economic damages, as well as necessary medical expenses and lost wages.

91.    To bring BI Claims or UM Claims, individuals must establish they have: (a) a significant and permanent loss of an important bodily function, or (b) a permanent injury (other than scarring or disfigurement) within a reasonable degree of medical probability. (Fla. Stat. § 627.737(2).)

92.    Defendants' Predetermined Protocol, along with the corresponding bills and supporting documentation that are fraudulent, are designed to facilitate—and do facilitate—fraudulent claims for No-Fault Benefits, and to

develop and maintain apparent *quid pro quo* cross-referral relationships with PI Attorneys by supporting the PI Attorneys' ability to profit from inflated BI Claims against at-fault drivers and inflated UM Claims against their clients' own insurers if recovery under the BI Claims is insufficient to satisfy the clients' purported damages.

### C. The Legitimate Treatment Of Patients With Strains And Sprains

93.     The LaRocca Chiropractors and Bacaner, Torres-Ruiz, and Rebein[3] purport to examine, diagnose, and treat patients who have been in auto accidents and complain of neck and/or back pain, among other ailments.

94.     For patients who have been in auto accidents and have legitimate complaints of neck and/or back pain, or other ailments, a provider must perform a detailed history and legitimate examination to arrive at a legitimate diagnosis.

95.     Based upon a legitimate diagnosis, a licensed professional must engage in medical decision-making to design a legitimate treatment plan tailored to the unique circumstances of the patient.   A licensed professional must also engage in medical decision-making to determine legitimate treatment goals that are tailored to the unique circumstances of the patient. During the course of care,

---

[3] Together, the LaRocca Chiropractors and Bacaner, Torres-Ruiz, and Rebein are referred to as the "LaRocca Providers."

treatment plans and goals should be modified based upon the unique circumstances of each patient and their response (or lack thereof) to treatment.

96. Legitimate treatment plans for patients with soft tissue injuries such as strains and sprains may involve no treatment at all because many of these kinds of injuries heal without any intervention, or a variety of interventions, including different combinations of medications to reduce inflammation and relieve pain, passive modalities, and/or active treatments depending on the unique circumstances of each patient.

97. Passive modalities do not require any affirmative effort or movement by patients. There are many kinds of passive modalities, including: (i) hot/cold packs, (ii) ultrasound, (iii) manual therapy, (iv) chiropractic manipulations, (v) traction, and (vi) cold laser. Active treatments require affirmative movement by patients and include a wide variety of exercises, strengthening, and stretching tailored to the unique circumstances of each patient, including the nature and location of the injuries, the patients' physical abilities, and the patients' response (or lack thereof) to any particular active treatment on any day or over time.

98. In legitimate treatment plans, passive modalities should generally be used only to the extent necessary to reduce pain and facilitate active treatments. To the extent they are needed at all, passive modalities should be administered early in treatment and transition over time to active treatments. Active treatments

should be introduced as soon as practicable to promote the actual healing of soft tissue injuries, including strains and sprains.

99.     The decision of which, if any, types of treatment are appropriate for each patient, as well as the frequency, extent, and duration of treatments, should vary depending on the unique circumstances of each patient, including: (a) the patient's age, social, and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; (d) the patient's mechanism of injury; (e) the patient's response (or lack thereof) to treatment; and (f) any other information available to the licensed professional regarding the patient's condition.

100.    Therefore, while one or more passive modalities may be medically necessary on any particular visit to reduce pain and facilitate the patient's ability to perform active treatments, the same or substantially similar combination of multiple passive modalities on nearly every visit would rarely, if ever, be appropriate for any patient, let alone virtually every patient.

101.    Treatment plans should be periodically reassessed and modified based upon the patient's progress and response (or lack thereof) to the treatment he or she has already received.  To the extent diagnostic tests such as x-rays and MRIs are performed, treatment plans should incorporate their results.

102. Patients should be discharged from treatment when they have reached maximum medical improvement ("MMI"), such that no further treatment is likely to benefit the patient, or when patients fail to respond to treatment.

103. The above-described process of examining, diagnosing, and treating patients must be appropriately documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patient, whose care and condition necessarily depends on the documentation of this information; and (d) payors such as State Farm Mutual and State Farm Fire, so that they can pay for reasonable and necessary treatment.

104. The LaRocca Providers do not legitimately examine, diagnose, or treat patients based upon their unique needs. Instead, the LaRocca Providers subject patients to the Predetermined Protocol in which patients receive virtually the same types of services, consisting primarily of passive modalities, throughout their treatment to exploit their No-Fault Benefits. Furthermore, the pervasive patterns in the documentation of services Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire are not credible and reflect such services were performed pursuant to the Predetermined Protocol, rather than because they were medically necessary to address the unique needs of each patient.

## V. THE FRAUDULENT PREDETERMINED PROTOCOL

105. When patients present to the LaRocca Clinics, they are not legitimately examined, diagnosed, or treated for their unique needs. Instead, the LaRocca Chiropractors subject patients to the Predetermined Protocol by purportedly performing examinations in which they document the same or similar complaints and injuries, and treating patients pursuant to a predetermined and medically unnecessary course of treatment at the LaRocca Clinics. The LaRocca Chiropractors also subject patients to medically unnecessary diagnostic imaging consisting of x-rays and DXD Studies. Additionally, the LaRocca Chiropractors refer patients to Bacaner, Torres-Ruiz, and Rebein who purport to perform examinations in which they document the same or similar injuries, including that patients sustained EMCs as a result of their accidents. Bacaner, Torres-Ruiz, and Rebein use these findings to support their recommendations that patients continue receiving the predetermined course of treatment at the LaRocca Clinics. The LaRocca Chiropractors provide the predetermined courses of treatment to exploit No-Fault Benefits until patients either unilaterally stop the treatment, or Bacaner, Torres-Ruiz, and Rebein perform final examinations discharging patients with permanent and unresolved injuries.

106. The bills and supporting documentation associated with the purported chiropractic and medical examinations, treatment, diagnostic imaging,

EMC findings, and other services purportedly rendered by the LaRocca Providers to patients, which Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire are fraudulent because they falsely represent services were medically necessary and lawfully rendered, when they were not. (*See* Fla. Stat. § 627.736(5)(b)(1)(b)-(c).) Each step in Defendants' fraudulent Predetermined Protocol is discussed next.

### A. The LaRocca Chiropractors' Fraudulent Initial Examinations

107. The first step in the Predetermined Protocol is for the LaRocca Chiropractors to purportedly perform initial examinations of patients documenting the same or similar nonspecific complaints and examination findings. For the majority of patients, the LaRocca Chiropractors document their initial examinations using two-page templates in which they handwrite comments purporting to summarize each patient's subjective complaints, examination findings, and other information ("Handwritten Initial Examinations"). Representative samples of the Handwritten Initial Examinations are attached hereto as Exhibit 16. For other patients, the LaRocca Chiropractors document their initial examinations using typewritten forms purporting to summarize each patient's subjective complaints, examination findings, and other information ("Narrative Initial Examinations"). Representative samples of the Narrative Initial Examinations are attached hereto as Exhibit 17.

108.    Defendants submit, or cause to be submitted, the Handwritten Initial Examinations and Narrative Initial Examinations to State Farm Mutual and State Farm Fire to support office visit charges and to justify the predetermined treatment and diagnostic imaging services purportedly provided to patients pursuant to the Predetermined Protocol.  The Handwritten Initial Examinations and Narrative Initial Examinations are described in detail below.

### 1.    Handwritten Initial Examinations

109.    In their Handwritten Initial Examinations, the LaRocca Chiropractors document non-credible patterns of patient complaints and examination findings that are designed to justify the LaRocca Providers' predetermined courses of treatment.  For example, the LaRocca Chiropractors document the overwhelming majority of patients suffer from nonspecific neck and/or back pain following their auto accidents.  (Ex. 2, cols. G-I; Ex. 16, p. 1, 3.)  The LaRocca Chiropractors also document examination findings, including "muscle tenderness" in at least the (i) posterior cervical paravertebral, (ii) upper trapezius, and/or (iii) posterior lumbar paravertebral areas for the overwhelming majority of patients.  (Ex. 2, cols. J-L; Ex. 16, p. 1, 3.)  In addition, for many patients, the LaRocca Chiropractors purport to find positive "palpation" tests and decreased range of motion in at least one but often two or more spinal regions.  (Ex. 16, p. 2, 4.)

110. The LaRocca Chiropractors rarely document in their Handwritten Initial Examinations the results of any neurological testing, including strength, reflex, and sensory testing, which would be indicated when patients complain of radiating pain. For example, in an intake form completed by patient H.K. during her initial visit to the LaRocca Clinics on July 24, 2017, she indicated she was experiencing pain that radiated into her arms and legs. (Ex. 18, p. 2.) However, in a Handwritten Initial Examination for H.K. prepared that same day, neither Michael LaRocca nor another LaRocca Chiropractor, Cambron, documented the results of any strength, reflex, and sensory testing, and therefore failed to perform necessary testing to meaningfully determine whether H.K.'s symptoms were caused by injuries to her nervous system. (*Id.* at p. 4-5.)

111. In addition to failing to document important clinical information, such as the results of neurological testing, the Handwritten Initial Examinations do not meaningfully document patient complaints or examination findings with sufficient specificity. Patient complaints are generically documented as "[n]eck pain," "[m]id-back pain," and/or "[l]ow-back pain." (Ex. 16, p. 1, 3.) The LaRocca Chiropractors rarely, if ever, use pain ratings, or any other measure to assess the nature and degree of each complaint. Furthermore, for examination findings, including findings of "tenderness" and "palpation," the LaRocca Chiropractors use vague descriptions of "+" or "-" that do not indicate the specific degree or

location of the patient's injury or condition contributing to his or her symptoms. (*Id.*) These vague and nonspecific descriptions of complaints and examination findings fail to provide critical clinical information regarding the patient's condition or establish a baseline to assess patient progress, or lack thereof, over time.

112. In addition to patient complaints and examination findings, the LaRocca Chiropractors document "procedures," or treatments, purportedly provided to each patient during his or her first visit to the LaRocca Clinics. (*Id.*) As described in more detail below (Section V.C), these treatments virtually always reflect patients receive the same or substantially similar combination of at least three passive modalities, including (i) manual therapy, (ii) chiropractic manipulations, (iii) cold laser (billed as an "unlisted modality" using CPT Code 97039), and (iv) cervical traction, and an active treatment, therapeutic exercises. Additionally, this list reflects many patients receive durable medical equipment, almost always a TENS unit, on their first visit to the LaRocca Clinics. (*Id.*; *see also* Ex. 1, col. P.)

113. Importantly, in their Handwritten Initial Examinations, the LaRocca Chiropractors do not include treatment plans tailored to the unique needs and circumstances of patients. (Ex. 2, col. N.) They do not document the types of modalities that should be used to address the patients' unique injuries and why,

the frequency with which each should be used (*e.g.*, as needed, every visit), or any specific types of active treatments to be performed. Instead, the LaRocca Chiropractors only document "3XWEEK" for virtually every patient regardless of the nature and severity of their injuries, length of time since their accident, or their response to any treatment they already received. (Ex. 2, col. M; Ex. 16, p. 1, 3.) Moreover, the LaRocca Chiropractors make no effort to document unique, measurable treatment goals to establish a baseline to assess the patient's progress, or lack thereof, over time. (Ex. 2, col. O.) The LaRocca Chiropractors do not document treatment plans or goals because patients are subjected to the same or substantially similar combination of at least three passive modalities on almost every date of service, plus a vague active treatment, regardless of their unique circumstances. The absence of unique treatment plans allows Defendants to exploit patients' No-Fault Benefits by submitting separate charges for multiple modalities on almost every date of service.

114. Taken together, the Handwritten Initial Examinations reflect similar patterns of patient complaints and examination findings that are not credible, and often lack critical clinical information regarding patients' complaints and symptoms. As a result, the Handwritten Initial Examinations indicate the LaRocca Chiropractors are not performing legitimate examinations. In addition, the absence of treatment plans and goals indicate the LaRocca Chiropractors are not

creating individualized treatment programs to address each patient's unique medical needs.

## 2. Narrative Initial Examinations

115. Like in their Handwritten Initial Examinations, the LaRocca Chiropractors document in their Narrative Initial Examinations non-credible patterns of patient complaints and examination findings that are designed to justify the LaRocca Providers' predetermined courses of treatment. The LaRocca Chiropractors purport to find the overwhelming majority of patients suffer from nonspecific bilateral neck and/or back pain, *see* Ex. 3, cols. H-I, which is almost always described as "moderate," "moderately severe," or "severe," *see* Ex. 17, p. 1, 3. The LaRocca Chiropractors also frequently document non-credible "objective" examination findings, including (i) subluxations in multiple vertebrae in typically two or more spinal regions and the sacrum and/or ilium; (ii) severe bilateral spasms in multiple areas of the neck and back; and (iii) severe pain in multiple vertebrae typically in at least two spinal regions. (Ex. 3, cols. J-M; Ex. 17, p. 1, 3.)

116. The LaRocca Chiropractors recently began using a new templated form to record their Narrative Initial Examinations in which they document non-credible findings of bilateral tenderness in multiple muscle groups, spasms in two or more regions of the spine, and "hypomobility" and "asymmetry" at vertebrae

in two or more regions of the spine and the sacrum for almost all patients.  (*See* Ex. 19 (representative sample of new templated form).)

117.    Unlike in the Handwritten Initial Examinations, in the Narrative Initial Examination, the LaRocca Chiropractors purport to document the results of neurological tests, including reflex testing.  (Ex. 17, p. 1, 3.)  However, none of the results they document matter because patients receive the same boilerplate treatment recommendations regardless of their symptoms or conditions.

118.    The LaRocca Chiropractors also purport to diagnose patients with injuries in at least two regions of the spine, including "spinal enthesopathy" in the cervical, thoracic, and/or lumbar regions of the spine.  (*Id.* at p. 2, 4.)  Additionally, the LaRocca Chiropractors virtually always report the patient's symptoms are "acute" in nature, even though the accidents for at least some patients occurred months before their initial examination at the LaRocca Clinics, indicating their symptoms related to the auto accident would not be acute.[4]  (Ex. 3, *compare* col. D *with* col. E.)

119.    In a section of the Narrative Initial Examinations labeled "plan," the LaRocca Chiropractors document treatments purportedly provided to the patient

---

[4] In general, the "acute" phase lasts up to the first few weeks after an injury.  To the extent the LaRocca Chiropractors document "acute" injuries during their initial examinations of patients whose auto accidents occurred months earlier, either: (a) the acute injuries did not occur during the auto accidents, or (b) the injuries are not acute.

during his or her initial visit to the LaRocca Clinics, and typically reflect patients received durable medical equipment, usually a TENS unit, during their initial visit. (Ex. 17, p. 2, 4.)

120. This "plan" section is not a legitimate treatment plan tailored to the unique needs and circumstances of patients. In fact, the LaRocca Chiropractors do not include individualized treatment plans in the Narrative Initial Examinations. (Ex. 3, col. P.) They do not document which modalities should be used to address the patients' unique injuries and why, the frequency with which each should be used, or any specific types of active treatments to be performed. Instead, they typically recommend only that the patient treat three times per week regardless of the nature and severity of their injuries, length of time since their accident, or any treatment previously received. (Ex. 3, col. O.) Nor do the LaRocca Chiropractors document treatment goals or a baseline to assess the patient's progress, or lack thereof, over time. (Ex. 3, col. Q.) The LaRocca Chiropractors do not document unique treatment plans or goals in their Narrative Initial Examinations because patients are subjected to the same or substantially similar combination of at least three passive modalities on almost every date of service, plus a vague active treatment, regardless of their unique circumstances. The absence of unique treatment plans allows Defendants to exploit patients' No-Fault Benefits by

submitting separate charges for multiple modalities on almost every date of service.

121.    Like the Handwritten Initial Examinations, the Narrative Initial Examinations reflect similar patterns of patient complaints and examination findings that are not credible and indicate the LaRocca Chiropractors are not performing legitimate examinations.  In addition, the absence of treatment plans and goals indicate the LaRocca Chiropractors are not creating individualized treatment programs to address each patient's unique medical needs.

**B.    Bacaner's, Torres-Ruiz's, And Rebein's Fraudulent Medical Examinations**

122.    Another important step in the Predetermined Protocol is for the LaRocca Chiropractors to refer patients to Bacaner, Torres-Ruiz, and Rebein for medical examinations.   Bacaner, Torres-Ruiz, and Rebein collectively have provided the overwhelming majority of these medical examinations since January 2017.

123.    Pursuant to the Predetermined Protocol, Bacaner, Torres-Ruiz, and Rebein  perform initial medical examinations ("Initial Medical Examinations") in which they purport to take the patient's history, examine and diagnose the patient, and formulate treatment recommendations.    As with the chiropractic examinations, Defendants bill for, and profit from, these examinations.

124.    Bacaner, Torres-Ruiz, and Rebein do not perform their Initial Medical Examinations for legitimate medical reasons.  Rather than legitimately examining patients and formulating treatment plans, Bacaner, Torres-Ruiz, and Rebein perform their Initial Medical Examinations to confirm patients are injured, attribute those injuries solely to the auto accidents, and support the alleged need for the predetermined course of care at the LaRocca Clinics.

125.    In addition, Bacaner, Torres-Ruiz, and Rebein perform their Initial Medical Examinations to falsely document nearly all patients sustained an EMC, which they use to further support the alleged need for the predetermined course of care at the LaRocca Clinics.  These findings of EMCs are not legitimate.  Instead, they are designed to exploit patients' available No-Fault Benefits and not to address their unique needs.

126.    Because of their ability to document findings of EMCs, Bacaner, Torres-Ruiz, and Rebein are critical to the success of Defendants' fraudulent scheme.  Before January 1, 2013, injured parties who were eligible for PIP Benefits were entitled to up to $10,000 of PIP Benefits for medically necessary goods and services.  Then, in 2012, the Florida Legislature amended the PIP Law in an effort "to reduce fraud in order to lower the cost of insurance premiums."  *Progressive Am. Ins. Co. v. Eduardo J. Garrido D.C. P.A.*, 211 So. 3d 1086, 1089 (Fla. Dist. Ct. App. 2017), *review denied sub nom. Eduardo J. Garrido D.C. P.A v. Progressive Am. Ins. Co.*,

2017 WL 2874837 (Fla. July 6, 2017). The amendment, which became effective on January 1, 2013, limited PIP Benefits to $2,500 unless a physician or other professional (including Bacaner, Torres-Ruiz, and Rebein) determined the injured person sustained an EMC. In that case, the injured person is eligible for PIP Benefits of up to $10,000 for such goods and services. (*See* Fla. Stat. § 627.736(1)(a)(3)-(4).)

127. Because chiropractors are not allowed under the PIP Law to diagnose patients with an EMC, Defendants could lawfully be limited to $2,500 in PIP Benefits without medical examinations performed by Bacaner, Torres-Ruiz, and Rebein. Thus, Defendants' scheme involves Bacaner, Torres-Ruiz, and Rebein performing medically unnecessary examinations of patients, which result in findings of EMCs to help ensure the full $10,000 in PIP Benefits are available for Defendants to exploit.

128. The LaRocca Chiropractors know Bacaner, Torres-Ruiz, and Rebein will document findings of EMCs before they even examine patients. For example, patient N.R.W. began treating at the LaRocca Clinics on February 14, 2020. (Ex. 1, Line 483.) During N.R.W.'s visit on February 24, 2020, Mayberry prepared a Handwritten Daily Note indicating the patient was scheduled for an appointment later that week with "MD" (*i.e.*, Rebein) "for EMC":



(Ex. 20.)

129.  Two days later, on February 26, 2020, Rebein purported to examine N.R.W. and prepared an Initial Medical Examination documenting—as Mayberry predicted—that N.R.W. sustained an EMC.  (*Id.*)

130.  Similarly, on October 29, 2020, a LaRocca Chiropractor purported to examine patient B.W. and prepared a Handwritten Initial Examination in which the LaRocca Chiropractor documented "EMC" under "Patient Instructions" and referred B.W. for an examination by Rebein.  (Ex. 21; *see also* Ex. 1, Line 602.)  On the same day, Rebein purported to examine B.W. and prepared an Initial Medical Examination finding B.W. sustained an EMC, just as the LaRocca Chiropractor instructed.  (*Id.*)  These examples show the EMC determinations made by Bacaner, Torres-Ruiz, and Rebein are not legitimate and predetermined.

### 1.  Bacaner's Initial Medical Examinations

131.  Bacaner's Initial Medical Examinations reflect non-credible patterns of examination findings and assessments of patients' current condition that are the same or similar across virtually all patients and designed to justify the predetermined course of treatment provided to patients at the LaRocca Clinics and

help ensure their full $10,000 in PIP Benefits are available for Defendants to exploit.

132. For example, Bacaner documents the overwhelming majority of patients have nonspecific "tenderness, tightness, and diminished range of motion" in their cervical and lumbar spinal regions. (Ex. 4, cols. F-K; Ex. 22, p. 2, 4 (representative samples of Bacaner's Initial Medical Examinations).) He does not describe the nature and degree of such "tenderness" and "tightness," including the particular vertebral segments or muscles of the cervical and lumbar spinal regions exhibiting such findings. (Ex. 22, p. 2, 4.) Nor does he indicate the degree limitation for range of motion or the plane (or planes) of movement purportedly reflecting limited range of motion. (*Id.*)

133. Although there are numerous orthopedic tests physicians can and should use depending on the unique circumstances of each patient to diagnose the injuries or conditions contributing to his or her symptoms, Bacaner rarely, if ever, documents the performance of orthopedic tests in his reports. (*See* Ex. 22.) Furthermore, Bacaner rarely, if ever, documents the performance of any neurological tests, including strength, reflex, and sensory testing, that are commonly used to diagnose patients, create treatment plans, and establish a baseline to assess the patient's progress, or lack thereof, over time. (*Id.*) Without such fundamental clinical information, Bacaner cannot—and does not—create

48

medically appropriate diagnoses of patients and individually tailored treatment plans.

134. Regardless of the patient's unique circumstances, histories, or injuries, Bacaner concludes the patient has sustained an "emergency medical condition(s) requiring ongoing medical treatment[.]" (Ex. 4, col. L; Ex. 22, p. 2, 4.) This finding helps ensure the patient's full $10,000 in PIP Benefits are available for Defendants to exploit. However, Bacaner's reports fail to meaningfully describe medical conditions that in the absence of treatment could result in serious jeopardy to patient health, serious impairment of bodily functions, or serious dysfunction of any bodily organ or part. (*See* Fla. Stat. § 627.732(16).) His reports, at best, describe soft tissue injuries that may not require any treatment at all because many of these injuries heal without any intervention. It is not credible that nearly all patients Bacaner examined sustained such serious injuries.

135. Bacaner's Initial Medical Examinations also purport to document nearly identical treatment recommendations for every patient, regardless of the patient's unique circumstances. Bacaner virtually always recommends patients begin or continue "chiropractic physiotherapy," without recommending any changes or modifications in the modalities purportedly provided to patients by the LaRocca Chiropractors. (Ex. 4, col. M; Ex. 22, p. 2, 4.)

136. Bacaner's nearly uniform recommendation to continue chiropractic care does not make clinical sense given his examinations are performed, at least in part, based on the patient's nonresponse to that same treatment previously provided at the LaRocca Clinics. The fact he does not recommend any changes to the chiropractic treatment shows his consultations are not legitimate and are predetermined.

137. Additionally, Bacaner almost always (i) recommends patients receive MRIs, typically of the cervical and lumbar spinal regions; and (ii) concludes the patient's conditions as documented in his reports were caused solely by the patient's motor vehicle accident. (Ex. 4, cols. N-O; Ex. 22, p. 2, 4.)

138. Collectively, the non-credible findings in Bacaner's Initial Medical Examinations and the absence of important clinical information that could be used to legitimately diagnose patients and formulate individually tailored treatment plans indicate the true purpose of such examinations is to rubber stamp the medically unnecessary treatment provided at the LaRocca Clinics and find patients sustained EMCs as a result of their accidents to ensure their full $10,000 in PIP Benefits are available for Defendants to exploit.

## 2. Torres-Ruiz's Initial Medical Examinations

139. Like Bacaner's Initial Medical Examinations, those prepared by Torres-Ruiz reflect non-credible patterns of examination findings and assessments

of patients' current condition that are the same or similar across virtually all patients and designed to justify the predetermined course of treatment provided to patients at the LaRocca Clinics and ensure their full $10,000 in PIP Benefits are available for Defendants to exploit.

140. Torres-Ruiz documents patients suffer from some combination of "tenderness, spasm, and guarding" in the cervical, thoracic, and lumbar spinal regions. (Ex. 5, cols. F-H, J, K-M; Ex. 23, p. 3, 8 (representative samples of Torres-Ruiz's Initial Medical Examinations).) Like Bacaner, Torres-Ruiz does not indicate the specific area of the cervical or lumbar spinal regions, such as a particular vertebrae or area of paraspinal muscles, purportedly exhibiting tenderness, spasm, and/or guarding. (Ex. 23, p. 3, 8.) In addition, Torres-Ruiz documents the overwhelming majority of patients have painful range of motion in the cervical and lumbar spinal regions. (Ex. 5, cols. I, N; Ex. 23, p. 3, 8-9.) Torres-Ruiz does not indicate the degree limitation for range of motion and rarely describes the nature and degree of pain experienced during range of motion testing. (Ex. 23, p. 3, 8-9.)

141. Without determining the specific pain generators and mechanisms of injury, and without documenting examination findings with specificity, Torres-Ruiz is unable to formulate a true diagnostic picture for patients or develop individually tailored treatment plans. Furthermore, he is unable to determine

whether and to what extent the patient is progressing in his or her course of treatment with the LaRocca Clinics.

142. Although there are numerous orthopedic tests providers can and should use to diagnose the injuries or conditions contributing to their symptoms, depending on the unique circumstances of each patient, Torres-Ruiz, like Bacaner, rarely, if ever, documents the performance of orthopedic tests in his reports. (*See* Ex. 23.) Additionally, although Torres-Ruiz purports to document the results of neurological tests, including strength, reflex, and sensory testing, none of the results he documents matter because all patients receive the same boilerplate treatment recommendations regardless of their symptoms or conditions.

143. Torres-Ruiz purports to diagnose virtually all patients with nonspecific "pain" in at least one but typically two or more spinal regions. (*Id.* at p. 3-4, 9.) Torres-Ruiz also concludes the patient's injuries were solely caused by his or her auto accident. (Ex. 5, col. P; Ex. 23, p. 4, 9.)

144. To help ensure Defendants can exploit the patient's full $10,000 in PIP Benefits, Torres-Ruiz concludes patients sustained EMCs as a result of their auto accidents. (Ex. 5, col. O; Ex. 23, p. 4, 9.) Like Bacaner's reports, Torres-Ruiz's reports fail to meaningfully describe medical conditions that in the absence of treatment could result in serious jeopardy to patient health, serious impairment of bodily functions, or serious dysfunction of any bodily organ or part. (*See* Fla. Stat.

52

§ 627.732(16).) His reports, at best, describe soft tissue injuries that may not require any treatment at all because many soft tissue injuries heal without any intervention. It is not credible nearly all of the patients Torres-Ruiz examined sustained such serious injuries.

145. Torres-Ruiz also purports to document nearly identical treatment recommendations for every patient, regardless of the patient's unique circumstances. He virtually always recommends patients continue or begin "physiotherapy" including (i) cold laser therapy, (ii) manual therapy, (iii) electric muscle stimulation, and (iv) therapeutic exercises. (Ex. 5, col. Q; Ex. 23, p. 4, 9-10.) Torres-Ruiz does not recommend any specific changes or modifications in the modalities purportedly provided to patients by the LaRocca Chiropractors. (Ex. 23, p. 4, 9-10.)

146. Torres-Ruiz's nearly uniform recommendation to continue chiropractic care does not make clinical sense given his examinations are performed, at least in part, based on the patient's nonresponse to the same treatment previously provided at the LaRocca Clinics. The fact he does not recommend any changes to the chiropractic treatment shows his consultations, like those performed by Bacaner, are not legitimate and are predetermined.

147. Collectively, the non-credible findings in Torres-Ruiz's Initial Medical Examinations and the absence of important clinical information that could

be used to legitimately diagnose patients and formulate individually tailored treatment plans indicate the true purpose of such examinations is to rubber stamp the medically unnecessary treatment provided at the LaRocca Clinics and to find patients sustained EMCs as a result of their accidents to ensure their full $10,000 in PIP Benefits are available for Defendants to exploit.

### 3. Rebein's Initial Medical Examinations

148. Like Bacaner's and Torres-Ruiz's Initial Medical Examinations, Rebein's Initial Medical Examinations reflect non-credible patterns of examination findings and assessments of patients' current condition that are the same or similar across virtually all patients and designed to justify the predetermined course of treatment provided to patients at the LaRocca Clinics and help ensure their full $10,000 in PIP Benefits are available for Defendants to exploit.

149. Rebein documents virtually all patients suffer from a combination of tenderness, tightness, spasm, and/or guarding in the cervical and lumbar spinal regions. (Ex. 6, cols. F, H; Ex. 24, p. 3, 7 (representative samples of Rebein's Initial Medical Examinations).) Like Bacaner and Torres-Ruiz, Rebein fails to indicate the specific area of the cervical or lumbar spinal regions, such as a particular vertebrae or area of paraspinal muscles, purportedly experiencing tenderness, tightness, spasm, and/or guarding. (Ex. 24, p. 3, 7.) In addition, Rebein's Initial Medical Examinations document the overwhelming majority of patients have

diminished and/or painful range of motion in the cervical and lumbar spinal regions. (Ex. 6, cols. G, I; Ex. 24, p. 3, 7.) However, Rebein's reports do not indicate the degree limitation for range of motion and rarely describe the nature and degree of pain experienced during range of motion testing. (Ex. 24, p. 3, 7.)

150. Without determining the specific pain generators and mechanisms of injury, and without documenting examination findings with specificity, Rebein — like Bacaner and Torres-Ruiz — is unable to formulate a true diagnostic picture for patients or develop individually tailored treatment plans. Furthermore, she is unable to determine whether and to what extent the patient is progressing in his or her course of treatment with the LaRocca Clinics.

151. Rebein, like Bacaner and Torres-Ruiz, rarely, if ever, documents the performance of orthopedic tests in her reports. (*See* Ex. 24.) Although Rebein purports to document the results of neurological tests, including strength, reflex, and sensory testing, none of the results she documents matter because all patients receive the same boilerplate treatment recommendations regardless of their symptoms or conditions.

152. To ensure Defendants can exploit the patient's full $10,000 in PIP Benefits, Rebein documents the same boilerplate conclusion as Bacaner and Torres-Ruiz that patients sustained EMCs as a result of their auto accidents. (Ex. 6, cols. J, K; Ex. 24, p. 3, 8.) Consistent with Bacaner and Torres-Ruiz, Rebein fails

to meaningfully describe medical conditions that in the absence of treatment could result in serious jeopardy to patient health, serious impairment of bodily functions, or serious dysfunction of any bodily organ or part. (*See* Fla. Stat. § 627.732(16).) Her reports, at best, describe soft tissue injuries that may not require any treatment at all because many of these injuries heal without any intervention. It is not credible nearly all patients Rebein examined sustained such serious injuries.

153.  Rebein purports to document nearly identical treatment recommendations for every patient, regardless of the patient's unique circumstances, including recommendations to begin or continue chiropractic care. (Ex. 6, col. L; Ex. 24, p. 4, 8.) Rebein does not recommend any specific changes or modifications to the modalities purportedly provided to patients by the LaRocca Chiropractors. (Ex. 24, p. 4, 8.) Like Bacaner and Torres-Ruiz, the fact Rebein does not recommend any changes to the chiropractic treatment tailored to the patient's unique needs shows her consultations are not legitimate and are predetermined.

154.  Taken together, the non-credible findings in Rebein's Initial Medical Examinations and the absence of important clinical information that could be used to legitimately diagnose patients and formulate individually tailored treatment plans indicate the true purpose of such examinations is to rubber stamp the medically unnecessary treatment provided at the LaRocca Clinics and to find

patients sustained EMCs as a result of their accidents to ensure their full $10,000 in PIP Benefits are available for Defendants to exploit.

### C.  The LaRocca Clinics' Fraudulent Treatment

155.  Following their initial examinations, the LaRocca Chiropractors subject virtually all of their patients to the Predetermined Protocol consisting of the same or substantially similar combination of at least three passive modalities and therapeutic exercises on nearly every visit.  (Ex. 1, cols. K-O.)  The treatment patients purportedly receive at the LaRocca Clinics is not meaningfully adjusted over time to address patients' progress, or lack thereof.

156.  In most instances, as reflected in Exhibit 1, the modalities purportedly provided to the LaRocca Clinics' patients consist of the same or substantially similar passive modalities (*i.e.*, manual therapy, chiropractic manipulations to multiple spinal regions, cold level laser (billed as an "unlisted modality"), and mechanical traction) at nearly every visit, regardless of the patient's response, or lack thereof, to such modalities.

157.  For example, patient P.F. treated at the LaRocca Clinics for 34 total visits spanning about three months from July 24, 2018 to October 15, 2018 and received the following passive modalities on nearly every visit: (1) manual therapy, (2) chiropractic manipulations, (3) cold laser, and (4) mechanical traction. (Ex. 1, Line 267.)  According to daily treatment notes prepared by the LaRocca

Chiropractors, P.F.'s condition stayed the "same" from visit to visit across her three-month course of care. (Ex. 25, p. 3, 5-7 (representative samples of P.F.'s Handwritten Daily Notes).) On October 15, 2018, Rebein prepared a Final Medical Examination documenting P.F. continued to suffer from (i) pain in her cervical region that "radiates to the right shoulder with a tingling sensation in the right hand"; (ii) pain in her upper and mid-back regions; (iii) pain in the low back region that "radiates to the right hip, leg, and feet with a numbness sensation"; (iv) headaches; (v) left pectoral tenderness; and (vi) pain in her right knee. (*Id.* at p. 8.) Rebein also documented (i) positive examination findings, including tenderness and spasm in P.F.'s cervical spinal region, painful range of motion in P.F.'s cervical and lumbar ranges of motion, and an antalgic (*i.e.*, abnormal) gait; and (ii) 17 total diagnoses, including injuries to all three spinal regions, caused solely by P.F.'s auto accident. (*Id.* at p. 11-12.) Finally, Rebein concluded P.F. "sustained unresolved, and permanent injuries specifically noted in the CERVICAL, THORACIC, and LUMBAR SPINE REGIONS." (*Id.* at p. 13 (emphasis in original).) Although none of P.F.'s injuries resolved during her three-month course of care and her response to treatment—as noted in Rebein's final report—was "limited with frequent recurring symptoms[,]" the LaRocca Chiropractors never meaningfully modified her treatment. (*Id.*)

158.    In addition to the same or substantially similar combination of at least three passive modalities, patients also purportedly receive active treatments (*i.e.*, therapeutic exercises) during their visits.  There is, however, no documentation regarding what frequency (*i.e.*, repetitions) or weight/resistance was involved with the active treatments, and whether those activities or exercises were clinically indicated.  Nor is there documentation describing how patients responded to any purported activities or exercise, whether changes were or should be made to the progression of activities or exercises over time, or any other information to show the activities or exercises were individually tailored to the patients' unique needs. Instead, the overwhelming majority of daily treatment notes prepared by the LaRocca Chiropractors indicate only that "Therapeutic Exercise" was purportedly performed by patients.  (Ex. 26 (representative samples of the Handwritten Daily Notes).)

159.    For example, patient P.F. purportedly performed therapeutic exercise on nearly every visit during the course of her three-month treatment at the LaRocca Clinics.  (Ex. 1, Line 267.)  However, her daily treatment notes never provide any details regarding the type of exercises or the number of sets and repetitions she purportedly performed, the total duration of her exercises, the muscles or structures involved in her exercises, or her response to the exercises and how the exercises should be adjusted to reflect her progress (or lack thereof).

(Ex. 25, p. 3, 5-7.)  Instead, P.F.'s daily treatment notes only indicate that "Therapeutic Exercise" was performed.  (*Id.*)  Quite simply, this statement is meaningless without more information.

160.  In fact, the only documentation regarding therapeutic exercises purportedly performed at the LaRocca Clinics that State Farm Mutual and State Farm Fire have received is a one-paragraph explanation[5] that patients use a "pivoting apparatus" (*i.e.*, wobble chair), *see* Ex. 27, that appears to be indicated for low back pain and occasional references to "Pettibon wobble chair exercises" in typewritten daily treatment notes prepared by the LaRocca Chiropractors.  The LaRocca Clinics have not provided documentation that use of the wobble chair satisfies the requirements for individually tailored one-on-one supervised therapy, which is a prerequisite for use of CPT Code 97110.  Furthermore, even if the LaRocca Chiropractors reference "Pettibon wobble chair exercises" in typewritten daily treatment notes, they fail to provide basic information regarding such exercises including what frequency (*i.e.*, repetitions) or weight/resistance was involved, and whether there was any progression in the exercises over time.

---

[5] Defendants only sporadically include this explanation with medical records and bills they submit to State Farm Mutual and State Farm Fire.

161. The absence of any credible documentation regarding therapeutic exercises indicates it is highly unlikely any clinically indicated exercises or other activities were actually performed.

162. The same or substantially similar combination of at least three passive modalities and a vague active treatment repeated across hundreds of patients and thousands of visits over the span of at least four years is not credible or clinically appropriate given the wide range of unique circumstances presented by each patient, including the patient's age, physical characteristics, symptoms, medical history, ability to participate in treatment, and his or her response, or lack thereof, to treatment. Moreover, this combination of modalities would rarely, if ever, be medically necessary for any patient to receive throughout the course of his or her treatment, let alone for nearly all patients to receive across the courses of their treatment.

D. **The Fraudulent Daily Treatment Notes**

1. <u>**The Fraudulent Handwritten Daily Notes**</u>

163. To support fraudulent charges for the medically unnecessary services provided at the LaRocca Clinics, Defendants submit, or cause to be submitted, to State Farm Mutual and State Farm Fire daily treatment notes for each visit prepared by LaRocca Chiropractors. The LaRocca Chiropractors document the majority of daily treatment notes using handwritten, check-the-box templates

("Handwritten Daily Notes") that are identical to forms used to prepare the Handwritten Initial Examinations. (*See* Ex. 26.)

164. Like in the Handwritten Initial Examinations, the LaRocca Chiropractors document in the Handwritten Daily Notes patients' subjective complaints by circling the area of the body where patients report pain. (*Id.*) The LaRocca Chiropractors report nonspecific complaints of neck and/or back pain for patients throughout their course of care at the LaRocca Clinics. The LaRocca Chiropractors rarely, if ever, provide any additional information regarding patients' subjective complaints, such as pain scores or a description of the nature and degree of pain, which could be used to establish a baseline to measure patient progress, or lack thereof, during treatment.

165. Furthermore, the LaRocca Chiropractors document "objective" complaints including "muscle tenderness" in at least the (i) posterior cervical paravertebral, (ii) upper trapezius, and/or (iii) posterior lumbar paravertebral areas for many patients throughout their entire course of care at the LaRocca Clinics, which often lasts months. (*Id.*) The Handwritten Daily Notes have spaces for the LaRocca Chiropractors to document the results of range of motion testing and "tenderness to palpation," but the LaRocca Chiropractors rarely, if ever, complete these sections. (*Id.*)

166.    Additionally, in the "Assessment" section of the Handwritten Daily Notes, the LaRocca Chiropractors fail to meaningfully document how patients respond to any of the modalities they purportedly received at each visit, or the patient's overall progress, or lack thereof, to any of the therapies over time.  (*Id.*)  Incredibly, in the overwhelming majority of the Handwritten Daily Notes, the LaRocca Chiropractors document each patient's condition remained the "same" from visit to visit throughout their course of care at the LaRocca Clinics, without recommending any changes to the patient's course of treatment.  (*Id.*)

167.    For instance, patient P.F. treated at the LaRocca Clinics for 34 total from July 24, 2018 to October 15, 2018.  (Ex. 1, Line 267.)  In a Handwritten Initial Examination prepared on July 26, LaRocca Chiropractor Mayberry purported to document P.F. suffered complaints of bilateral neck, mid-back, and low back pain, and had "objective" findings of "tenderness" across her neck and back.  (Ex. 25, p. 1-2.)  For each of P.F.'s subsequent visits during her three-month course of care, the LaRocca Chiropractors prepared Handwritten Daily Notes reflecting her condition stayed the "same"—meaning she showed no clinical improvement.  (*Id.* at p. 3, 5-7.)  Furthermore, the LaRocca Chiropractors documented P.F. continued to have "objective" findings of "tenderness" across her spine and complaints of pain in her neck, mid-back, and low back throughout her treatment.  (*Id.*)

Although P.F.'s injuries did not resolve during her three-month course of care, the LaRocca Chiropractors never meaningfully modified her treatment.

168.    Similarly, patients D.H. and G.T. were purportedly injured in the same accident on March 23, 2019 and began treating at the LaRocca Clinics on the same day, April 1, 2019.  (Ex. 1, Lines 371 and 372.)  The Handwritten Daily Notes prepared by the LaRocca Chiropractors reflect D.H.'s and G.T.'s conditions stayed the "same" across their nearly three-month course of care.  (Ex. 28, p. 1, 3-4 (representative samples of D.H.'s Handwritten Daily Notes); Ex. 29, p. 1, 3-4 (representative samples of G.T.'s Handwritten Daily Notes).)  The Handwritten Daily Notes prepared by the LaRocca Chiropractors also document D.H. and G.T. had "objective" findings of "muscle tenderness" in multiple regions of their spine and suffered complaints of pain in their neck, mid-back, and low back throughout their courses of treatment.  (*Id.*)  Furthermore, both patients received identical treatments, consisting of the same four passive modalities, on nearly every date of service and ended treatment on the same day, June 24, 2019.  (Ex. 1, Lines 371 and 372.)  The LaRocca Chiropractors never meaningfully modified D.H.'s and G.T.'s treatment despite the fact none of their injuries resolved during their nearly three-month course of care.

169.    In the Handwritten Daily Notes, the LaRocca Chiropractors purport to document treatment patients receive on each visit.  (*See* Ex. 26.)  The treatments

purportedly provided to patients are virtually identical and consist of the same or substantially similar combination of at least three passive modalities, including manual therapy, chiropractic manipulations to multiple spinal regions, cold level laser, and mechanical traction, at nearly every visit, regardless of the patient's response, or lack thereof, to such modalities. As explained above (Section V.C), although the LaRocca Chiropractors purport to document patients engage in therapeutic exercise, they do not provide sufficient information regarding the types of exercise patients purportedly performed. There is no documentation regarding what frequency or weight/resistance was involved with the active treatments, and whether those activities or exercises were clinically indicated. Furthermore, the LaRocca Chiropractors fail to document any progression in exercises over time.

170. Additionally, the LaRocca Chiropractors fail to meaningfully document in the Handwritten Daily Notes how patients respond to the modalities they purportedly received at each visit, or the patient's overall progress, or lack thereof, to any of the therapies over time.

## 2. The Fraudulent Narrative Daily Notes

171. In addition to the Handwritten Daily Notes, for some patients, Defendants also submit, or cause to be submitted, to State Farm Mutual and State Farm Fire daily treatment notes for visits using a typewritten form ("Narrative

Daily Notes") similar to the forms used to prepare the Narrative Initial Examinations. (*See* Ex. 30 (representative samples of the Narrative Daily Notes).) Like the Handwritten Daily Notes, the Narrative Daily Notes contain non-credible patterns regarding patients' complaints and progress.

172.     Despite the litany of treatment modalities purportedly provided to patients during their treatment at the LaRocca Clinics, in the "subjective" sections of the Narrative Daily Notes, the LaRocca Chiropractors document many patients continue to suffer moderate to severe bilateral neck and/or back pain throughout their treatment at the LaRocca Clinics. (*Id.*)

173.     As described above (Section V.A.2), in the "objective" sections of the Narrative Initial Examinations, the LaRocca Chiropractors purport to document not only that patients have joint subluxations, spasms, and pain across multiple regions of the spine, but also document the specific vertebrae that purportedly manifest these subluxations, spasms, and pain. After the patient's initial examination, in subsequent Narrative Daily Notes, the LaRocca Chiropractors continue documenting which specific vertebrae are affected at each visit. (*Id.*) Incredibly, the specific locations of the subluxations, spasms, and pain documented in the Narrative Daily Notes are virtually always identical to the locations documented in the Narrative Initial Examinations. Indeed, this pattern of copying findings in the Narrative Initial Examinations is seen across virtually

every Narrative Daily Note from a patient's initial examination to the end of his or her treatment, which is often months later. These types of pervasive patterns are not credible and highly implausible as they present across dozens of patients, whose age, pre-existing conditions, mechanism of injuries, and a host of other important factors, vary markedly. Instead, they indicate the LaRocca Chiropractors are not performing legitimate physical examinations and instead are documenting fabricated, predetermined findings for patients.

174. For example, for patient R.A., Major created a Narrative Initial Examination on March 8, 2017 reflecting R.A. had "objective" findings including (i) subluxations on the right at C2, T6, the ilium, and the sacrum, and on the left at C5, T2, L1, and L5; (ii) severe muscle spasms in the suboccipital, cervical, upper thoracic, mid thoracic, lower thoracic, and lumbar regions bilaterally; and (iii) severe pain in 20 vertebral segments, specifically at the occiput-T6 and T12-L5 bilaterally. (Ex. 31, p. 1; *see also* Ex. 1, Line 30.)

175. When Major saw R.A. two days later on March 10, he documented the same "objective" findings in the Narrative Daily Note as he did in the Narrative Initial Examination, including (i) subluxations of the same severity and in the same location across the same 6 unique vertebrae, the ilium, and the sacrum; (ii) severe spasms in the suboccipital, cervical, upper thoracic, mid thoracic, lower thoracic,

and lumbar regions bilaterally; and (iii) severe pain in the same 20 vertebral segments at the occiput-T6 and T12-L5 bilaterally:

March 10, 2017 Narrative Daily Note

Objective: The C2 segment was noted to be subluxated posteriorward on the right. A left posterior rotational subluxation of C5 was noted. A left posterior displacement of the 2nd thoracic segment was evident. A check of the 6th thoracic vertebra showed a right posterior rotational subluxation. The first lumbar segment shows a left posterior subluxation. Lumbar segment L5 is found to be in a left posterior malaligned position. The right ilium is subluxated posteriorward. There is a right posterior displacement of the sacrum on palpation. In checking for muscle rigidity, an extreme amount of muscle tightness and spasm in the suboccipital muscles bilaterally, cervical paraspinal muscles bilaterally, upper thoracic muscles bilaterally, mid thoracic muscles bilaterally, lower thoracic muscles bilaterally and lumbar paraspinal muscles bilaterally was determined. Examination performed by palpation over the spinal vertebral segments showed a severe pain at the occiput to T6 and T12 to L5 bilaterally.

(Ex. 31, p. 2.)

176. Two weeks later, on March 24, a different LaRocca Chiropractor, Hunt, saw R.A. and purported to find subluxations, spasms, and pain in the same specific locations and of the same severity as those documented by Major in the Narrative Initial Examination:[6]

---

[6] Defendants appear to use a computer program to generate the Narrative Initial Examinations and Daily Notes. To further their scheme to defraud, Defendants abuse this program by applying different language, phrases, and sentence structure in patient records to make it appear the "objective" findings are legitimate and individualized to each patient when in fact they are copied from one visit to the next. For example, Defendants replace certain descriptive terms like "extreme" with synonyms like "marked" and phrases like "right posterior displacement of the sacrum" with "[t]he sacrum was noted to be subluxated posteriorward on the right" to give the illusion of variability in the Narrative Daily Notes, when in fact such terms and phrases describe identical symptoms. This furthers Defendants' fraudulent scheme by concealing that they do not legitimately examine patients and, instead, simply copy non-credible findings from visit to visit.

March 24, 2017 Narrative Daily Note

Objective: Vertebral segment C2 is found to be subluxated posterior on the right. A left posterior rotational subluxation of C5 was noted. A left posterior displacement of the 2nd thoracic segment was evident. A check of the 6th thoracic vertebra showed a right posterior rotational subluxation. A left posterior rotational subluxation of the 1st lumbar was noted. A left posterior rotational subluxation of L5 was noted. There is indication on palpation of a right posterior ilium. The sacrum was noted to be subluxated posteriorward on the right. In checking for muscle rigidity, a marked spasticity in the suboccipital muscles bilaterally, cervical paraspinal muscles bilaterally, upper thoracic muscles bilaterally, mid thoracic muscles bilaterally, lower thoracic muscles bilaterally and lumbar paraspinal muscles bilaterally was determined. In checking the spinal tissues for pain, there was clear indication of a strong pain level at the occiput to T6 and T12 to L5 bilaterally.

(*Id.* at p. 3.)

177.    Indeed, although two different LaRocca Chiropractors saw R.A. 27 subsequent times between March 24 and R.A.'s final visit nearly four months later on July 12, the LaRocca Chiropractors documented "objective" spinal examination findings across all of the Narrative Daily Notes that were *identical* in location and severity to the findings documented in the Narrative Initial Examination, namely: (i) subluxations on the right at C2, T6, the ilium, and the sacrum, and on the left at C5, T2, L1, and L5; (ii) severe muscle spasms in the suboccipital, cervical, upper thoracic, mid thoracic, lower thoracic, and lumbar regions bilaterally; and (iii) severe pain in the same 20 vertebral segments at the occiput-T6 and T12-L5 bilaterally.

178.    The records Defendants prepared for other patients show similarly incredible patterns. For example, patient T.M. treated at the LaRocca Clinics for 37 visits across the span of over four months from February 8, 2017 to June 19, 2017. (Ex. 1, Line 12.) On February 8, 2017, Hunt prepared a Narrative Initial

69

Examination documenting T.M. had (i) subluxations on the right at C7, and on the left at C2, L1, L5, and the sacrum; (ii) severe muscle spasms in the suboccipital, cervical, upper thoracic, lower thoracic, and lumbar regions bilaterally; and (iii) moderate pain bilaterally at the occiput-T2 and T11-L5. (Ex. 32, p. 1.) Over the next four months, three different LaRocca Chiropractors, including Hunt, Major, and Stewart, documented identical "objective" findings in the Narrative Daily Notes. (*Id.* at p. 3-5 (representative samples of T.M.'s Narrative Daily Notes).)

179. Additionally, patient C.S. treated at the LaRocca Clinics for 33 visits across the span of about four months from August 17, 2018 to December 11, 2018. (Ex. 1, Line 280.) On August 17, 2018, Semia prepared a Narrative Initial Examination documenting C.S. had (i) subluxations on the right at C2, T1, and T11, and on the left at C4, T7, and L2; (ii) severe muscle spasms in the suboccipital, cervical, upper thoracic, lower thoracic, mid thoracic, and lumbar regions bilaterally; and (iii) moderate pain bilaterally at C1-L2. (Ex. 33, p. 1.) Over the next four months and 32 visits, Semia and Major prepared Narrative Daily Notes documenting identical findings at every visit of (i) subluxations in the same six vertebrae, including C2, T1, and T11 on the right, and C4, T7, and L2 on the left; (ii) spasms of the same severity (severe) and in the same locations (suboccipital, cervical, upper thoracic, lower thoracic, mid thoracic, and lumbar regions bilaterally); and (iii) pain of the same severity (moderate) in the same 21 vertebrae

(C1-L2 bilaterally). (*Id.* at p. 3-4 (representative samples of C.S.'s Narrative Daily Notes).)

180. This pattern of copying findings from one visit to the next occurs across almost all patients for whom the LaRocca Chiropractors prepare Narrative Daily Notes and reflects pervasive patterns that are not credible across dozens of patients whose age, pre-existing conditions, mechanism of injuries, and a host of other important factors, vary markedly. Such uniformity in purported physical examination findings across time, patients, and chiropractors is not only non-credible, but highly implausible, if not physiologically impossible. Instead, these repeated identical "findings" demonstrate the LaRocca Chiropractors are not conducting legitimate physical examinations and are simply copying the key findings following each Narrative Initial Examination to justify the predetermined treatment modalities charged by the LaRocca Clinics.

181. In the Narrative Daily Notes, the LaRocca Chiropractors purport to document treatment each patient received on each visit. (*See* Ex. 30.) The treatments purportedly provided to patients are virtually identical and consist of the same or substantially similar combination of at least three passive modalities, including manual therapy, chiropractic manipulations to multiple spinal regions, cold level laser, and mechanical traction, at nearly every visit, regardless of the patient's response, or lack thereof, to such modalities. As described above (Section

V.C), although the LaRocca Chiropractors report patients engage in active therapies, they rarely provide specific information regarding the types of exercise the patient purportedly performed other than documenting patients performed "Pettibon wobble chair exercises." There is no documentation regarding what frequency or weight/resistance was involved with the active treatments, and whether there was any progression in exercises over time.

182. Like in the Handwritten Daily Notes, the LaRocca Chiropractors fail to meaningfully document in the Narrative Daily Notes how patients respond to any of the modalities they purportedly received at each visit, or the patient's overall progress, or lack thereof, to any of the therapies over time.

### E.    The LaRocca Providers' Fraudulent Re-Examinations

183. Because patients are unique and respond differently to injuries and interventions, treatment plans should be periodically reassessed and modified, if appropriate, but there is no indication the LaRocca Providers ever perform a meaningful re-examination of their patients' progress to assess whether treatment plans should be modified.

184. To begin, many patients are not re-examined at all during their course of care at the LaRocca Clinics. For example, patient G.C. treated at the LaRocca Clinics for 31 total visits across the span of about five and a half months from August 11, 2017 to January 31, 2018. (Ex. 1, Line 91.) Patient G.C. purportedly

received the same combination of passive modalities on virtually every visit, including manual therapy, chiropractic manipulations, and cold laser on all 31 visits, and mechanical traction on 30 visits. (*Id.*) None of the Handwritten Daily Notes prepared by the LaRocca Chiropractors indicate they re-examined G.C. to assess whether his treatment plan should be modified. (Ex. 34, p. 1-5 (representative samples of G.C.'s Handwritten Daily Notes).) Instead, the LaRocca Chiropractors applied the same predetermined treatments on nearly every visit despite the fact G.C.'s condition remained the "same" throughout his five-and-a-half-month course of care. (*Id.*)

185. While the LaRocca Chiropractors purport to re-evaluate some patients, their re-examinations do not result in meaningful changes to the patients' treatment regimen. The LaRocca Chiropractors document their re-examinations using the handwritten or typewritten narrative forms described above. (*See* Ex. 35 (representative samples of the re-examinations).) Regardless of which form is used, the LaRocca Chiropractors continue to document patient complaints to multiple areas of the body, including the neck and/or back. (*Id.*) Additionally, the LaRocca Chiropractors continue to document "objective" findings including nonspecific "muscle tenderness," if a handwritten form is used, or joint subluxations, spasms, and pain, if a typewritten narrative form is used, in multiple regions of the spine. (*Id.*)

186. Many re-examinations recommend patients continue with the predetermined treatment regardless of whether they demonstrated any improvement. Many other re-examinations do not make any recommendations regarding patients' treatment plan because it is understood patients will continue receiving the same predetermined and fraudulent treatment as before their re-examinations. At best, the LaRocca Chiropractors' re-examinations result in only a decrease in the frequency of treatment.

187. Overall, the re-examinations include boilerplate examination findings, diagnoses, and/or assessments that vary little, if at all, from those documented in the Handwritten Initial Examinations and Narrative Initial Examinations. For example, patient T.B. was purportedly injured in an auto accident on January 9, 2017 and began treating at the LaRocca Clinics on January 16. (Ex. 1, Line 2.) On that day, Hunt prepared a Narrative Initial Examination reflecting T.B. (1) suffered from (i) "constant" and "severe" pain bilaterally in her neck, upper back, and lower back, (ii) "constant" and "moderately severe" pain in both arms, (iii) "frequent" and "moderately severe" pain in both hands, and (iv) "numb and pins and needle sensations"; and (2) had "objective" findings including (i) subluxations on the right at C2 and T6, and on the left at C7, L1, L5, and the sacrum; (ii) severe spasms in the suboccipital, cervical, upper thoracic, mid

thoracic, lower thoracic, and lumbar muscles bilaterally; and (iii) severe pain in 21 vertebrae at occiput-T6 and T11-L5 bilaterally. (Ex. 36, p. 1.)

188. For the next 18 visits spanning across a month and a half, T.B. received the same treatments at virtually every date of service, including the same passive modalities of manual therapy, chiropractic manipulations, cold laser, and mechanical traction. On February 27, a different LaRocca Chiropractor, Major, purportedly performed a re-examination of T.B. Despite all of the treatment purportedly provided to T.B., Major prepared a re-examination documenting the *same* complaints and "objective" findings as Hunt's Narrative Initial Examination, specifically: (1) identical complaints of (i) "constant" and "severe" pain bilaterally in her neck, upper back, and lower back, (ii) "constant" and "moderately severe" pain in both arms, (iii) "frequent" and "moderately severe" pain in both hands, and (iv) "numb and pins and needle sensations"; and (2) identical "objective" findings of (i) subluxations on the right at C2 and T6, and on the left at C7, L1, L5, and the sacrum; (ii) severe spasms in the suboccipital, cervical, upper thoracic, mid thoracic, lower thoracic, and lumbar muscles bilaterally; and (iii) severe pain in the same 21 vertebrae at occiput-T6 and T11-L5 bilaterally. (*Id.* at p. 3.) Although T.B.'s condition had not demonstrated any improvement in her first month and a half of treatment, Major failed to modify her treatment plan. (*Id.* at p. 3-4.)

189.    T.B. continued treating at the LaRocca Clinics for another four visits, receiving the same passive modalities of manual therapy, chiropractic manipulations, cold laser, and mechanical traction on every visit.  On March 8, Major purportedly performed a second re-examination, which *continued* to document the same complaints and "objective" findings as Hunt's Narrative Initial Examination, including (1) continued identical complaints of (i) "constant" and "severe" pain bilaterally in her neck, upper back, and lower back, (ii) "constant" and "moderately severe" pain in both arms, (iii) "frequent" and "moderately severe" pain in both hands, and (iv) "numb and pins and needle sensations"; and (2) continued identical "objective" findings of (i) subluxations on the right at C2 and T6, and on the left at C7, L1, L5, and the sacrum; (ii) severe spasms in the suboccipital, cervical, upper thoracic, mid thoracic, lower thoracic, and lumbar muscles bilaterally; and (iii) severe pain in the same 21 vertebrae at occiput-T6 and T11-L5 bilaterally.  (*Id.* at p. 5.)  Major again failed to modify T.B.'s treatment plan in any way despite her lack of improvement.  (*Id.* at p. 5-6.)

190.    T.B. continued treating at the LaRocca Clinics for another eight visits across about a month, receiving the same passive modalities of manual therapy, chiropractic manipulations, cold laser, and mechanical traction on every visit. After two and a half months of total treatment, on her last daily visit to the LaRocca Clinics on March 29, Major prepared a Narrative Daily Note reflecting none of

T.B.'s conditions had meaningfully improved. Major purported to find the same "objective" findings documented during her initial visit two and a half months, specifically: (i) subluxations on the right at C2 and T6, and on the left at C7, L1, L5, and the sacrum; (ii) severe spasms across her entire back in the suboccipital, cervical, upper thoracic, mid thoracic, lower thoracic, and lumbar muscles bilaterally; and (iii) severe pain in the same 21 vertebrae at occiput-T6 and T11-L5 bilaterally. (*Id.* at p. 7.) Despite the fact T.B. failed to demonstrate meaningful improvement, the LaRocca Chiropractors never meaningfully modified her treatment plan, and instead relentlessly applied the Predetermined Protocol.

191. Taken together, the patterns of documenting continued complaints of pain and positive examination findings and recommending the same predetermined course of treatment (if any recommendation is made at all) in re-examinations performed at the LaRocca Clinics demonstrate the LaRocca Chiropractors do not re-examine patients to legitimately evaluate their conditions and progress, or to make medical decisions that are necessary to address their unique needs. Instead, the patterns of patient complaints and positive examination findings, and absence of meaningful modifications to patients' treatment plans, demonstrate the LaRocca Chiropractors perform re-examinations as a pretext to support predetermined recommendations for continued treatment and to facilitate separate office visit charges. As a result, the LaRocca

Chiropractors' re-examinations are fraudulent.  (*See* Fla. Stat. §§ 627.732(11) and 627.736(5)(b)(1)(c).)

## F.    The LaRocca Chiropractors' Fraudulent Diagnostic Imaging

192.    In addition to fraudulent chiropractic treatments, the LaRocca Providers also purport to perform diagnostic imaging on the overwhelming majority of patients.  During their initial visit at the LaRocca Clinics, many patients receive multiple x-rays to their cervical and/or lumbar spinal regions, which is highly unusual among patients purportedly suffering from the types of soft tissue injuries documented by the LaRocca Providers.  (Ex. 1, cols. S-T.)  The LaRocca Chiropractors rarely, if ever, document any rationale for performing these x-rays. Furthermore, the LaRocca Chiropractors rarely, if ever, document how treatment should be modified based upon the results of x-rays, which demonstrates such diagnostic imaging is not medically necessary.

193.    The LaRocca Chiropractors also perform DXD Cervical Radiographic Spinal Analyses ("DXD Studies") for many patients.  (Ex. 7.)  These DXD Studies are fraudulent because they always reflect patients suffer from "ligamentous instability" in their cervical spinal region.  (Ex. 7, col. F; Ex. 37, p. 1 (representative sample of the DXD Studies).)  The LaRocca Chiropractors do not integrate this finding into patients' treatment plans, even though true ligamentous instability is a contraindication for performing chiropractic manipulations and traction to the

cervical spinal region. Many patients for whom the LaRocca Chiropractors document "ligamentous instability" in their DXD Studies purportedly receive these potentially contraindicated therapies throughout their treatment at the LaRocca Clinics. For example, on August 2, 2018, Michael LaRocca performed a DXD Study for patient P.F. and reported "[l]igamentous instability is present in the Cervical spine." (Ex. 25, p. 4.) Despite this potentially serious finding which—if true—would require chiropractic therapies such as manipulations and traction to be altered or completely stopped to avoid potentially causing further harm to the patient, the LaRocca Chiropractors prepared a Handwritten Daily Note on the same day reflecting P.F. received chiropractic manipulations and traction to her cervical spine. (*Id.* at p. 3.) The LaRocca Chiropractors continued to perform chiropractic manipulations and traction to P.F.'s cervical spine on nearly all of her remaining visits over the span of two months at the LaRocca Clinics.

194. On April 11, 2019, Michael LaRocca performed DXD Studies for two patients involved in the same accident, D.H. and G.T., and reported identical findings of "[l]igamentous instability is present in the Cervical spine." (Ex. 28, p. 2; Ex. 29, p. 2.) On the same day, the LaRocca Chiropractors prepared Handwritten Daily Notes for both patients reflecting they received chiropractic manipulations to their C5 vertebral segment and cervical traction. (Ex. 28, p. 1; Ex. 29, p.1.) The LaRocca Chiropractors never meaningfully modified D.H.'s and G.T.'s treatment

plans and instead continued performing chiropractic manipulations and traction to D.H.'s and G.T.'s cervical spine on virtually all of their remaining visits over the span of almost two and a half months.

### G. The Fraudulent Final Medical Examinations

195. Pursuant to the Predetermined Protocol, Defendants continue to exploit patients' No-Fault Benefits until patients unilaterally stop the treatment, or Bacaner, Torres-Ruiz, and Rebein perform final examinations ("Final Medical Examinations") discharging them with permanent and unresolved injuries.

196. Like their Initial Medical Examinations, Bacaner, Torres-Ruiz, and Rebein do not perform their Final Medical Examinations for legitimate medical reasons. Instead, they perform Final Medical Examinations to confirm virtually all patients (i) continue to suffer neck and/or back pain, despite purportedly receiving extensive treatments at the LaRocca Clinics, (ii) are permanently injured, and (iii) continue to need further treatment. These findings and conclusions are not legitimate and instead serve to further the Predetermined Protocol and meet the statutory threshold for, and inflate the value of, BI and UM Claims.

197. Representative samples of the Final Medical Examinations performed by Bacaner, Torres-Ruiz, and Rebein are attached hereto as Exhibits 38, 39, and 40, respectively.

## 1. Bacaner's Fraudulent Final Medical Examinations

198.    Bacaner's Final Medical Examinations contain boilerplate physical examination findings, diagnoses, and conclusions that are not credible.  As an initial matter, despite patients purportedly receiving extensive treatments at the LaRocca Clinics, Bacaner documents the overwhelming majority of patients end treatment with continued complaints of pain, often in their cervical or lumbar spinal regions, or both.  (Ex. 8, col. F; Ex. 38, p. 1, 3, 5, 7.)

199.    Moreover, Bacaner documents patients continue to have diminished or limited range of motion in their cervical and/or lumbar spinal regions, as well as tightness or tenderness in their spine.  (Ex. 8, cols. G-H; Ex. 38, p. 2, 6.)  Bacaner fails to indicate the degree limitation for range of motion.  (Ex. 38, p. 2, 6.)

200.    Regardless of the patient's unique circumstances or purported examination results, Bacaner purports to document nearly identical treatment conclusions for every patient.   Despite the extensive treatments patients purportedly received during their treatment at the LaRocca Clinics, Bacaner virtually always concludes patients continue to suffer "post-traumatic" conditions and have "sustained permanent injuries" as a result of their auto accident.  (Ex. 8, col. I; Ex. 38, p. 3, 7.)  The uniformity of such a serious finding across patients is not legitimate given many of the soft tissue injuries purportedly experienced by patients at the LaRocca Clinics heal without any intervention.  Moreover, the

uniformity of this finding is not credible across a wide and diverse patient population of varying conditions, limitations, and abilities.

201. Additionally, Bacaner virtually always recommends patients continue treatment despite the litany of treatment already received at the LaRocca Clinics. (Ex. 8, col. J; Ex. 38, p. 3-4, 7-8.)

202. When viewed collectively, these patterns in purported findings, diagnoses, and treatment conclusions are not credible given the broad spectrum of patients' preexisting conditions, medical histories, and symptoms. Instead, these uniform patterns show Bacaner is not performing legitimate physical examinations, making legitimate diagnoses, and reaching legitimate conclusions or treatment recommendations tailored to each patient's unique needs, but rather is using predetermined findings and conclusions to give the illusion of severe conditions, diagnoses, and future medical needs of patients that further the Predetermined Protocol and support the statutory threshold for, and inflate the value of, the patients' BI and UM Claims.

## 2. **Torres-Ruiz's Fraudulent Final Medical Examinations**

203. Like Bacaner's Final Medical Examinations, Torres-Ruiz's Final Medical Examinations contain boilerplate physical examination findings, diagnoses, and conclusions that are not credible.

204. In his Final Medical Examinations, Torres-Ruiz documents the overwhelming majority of patients end treatment with continued complaints of pain, often in their neck or back, or both, even though many of the patients he examined purportedly received extensive treatments often lasting months at the LaRocca Clinics. (Ex. 9, cols. F-G; Ex. 39, p. 1, 7.) Additionally, Torres-Ruiz purports to find the overwhelming majority of patients continue to suffer from a combination of "tenderness, spasm, and guarding" in the cervical and/or lumbar spinal regions. (Ex. 9, cols. H-J, L, M-O; Ex. 39, p. 3, 9.) Like in his Initial Medical Examinations, in his Final Medical Examinations, Torres-Ruiz does not indicate the specific area of the cervical or lumbar spinal regions, such as a particular vertebra or area of paraspinal muscles, purportedly exhibiting tenderness, spasm, and/or guarding. (Ex. 39, p. 3, 9.) Torres-Ruiz's Final Medical Examinations also document the overwhelming majority of patients continue to have painful range of motion in the cervical and lumbar spinal regions. (Ex. 9, cols. K, P; Ex. 39, p. 3, 9.) However, Torres-Ruiz's final reports rarely describe the nature and degree of pain experienced during range of motion testing. (Ex. 39, p. 3, 9.)

205.    Regardless of the patient's unique circumstances or purported examination results, Torres-Ruiz, like Bacaner, purports to document nearly identical treatment conclusions for every patient.  Despite the extensive treatment patients purportedly received during their course of care at the LaRocca Clinics, which often lasts months, Torres-Ruiz virtually always concludes patients have unresolved and permanent injuries as a result of their auto accident.  (Ex. 9, col. Q; Ex. 39, p. 5, 11.)  The uniformity of such a serious finding across patients is not legitimate given many of the soft tissue injuries purportedly experienced by patients at the LaRocca Clinics heal without any intervention.  Moreover, the uniformity of this finding is not credible across a wide and diverse patient population of varying conditions, limitations, and abilities.  Furthermore, Torres-Ruiz almost always concludes the patient's response to treatment has been limited with "recurring" symptoms, despite the fact the LaRocca Providers do not meaningfully modify treatments in response to a patient's lack of progress.  (Ex. 9, col. R; Ex. 39, p. 5, 11.)

206.    Torres-Ruiz also recommends additional treatment for nearly every patient despite the litany of therapies already received at the LaRocca Clinics.  (Ex. 9, col. S; Ex. 39, p. 5-6, 11-12.)

207.    These patterns in purported findings and treatment conclusions are not credible given the wide variety of patients' preexisting conditions, medical

histories, and symptoms. Instead, these uniform patterns show Torres-Ruiz is not performing legitimate physical examinations, making legitimate diagnoses, and reaching legitimate conclusions or treatment recommendations tailored to each patient's unique needs, but rather is using predetermined findings and conclusions to give the illusion of severe conditions, diagnoses, and future medical needs of patients that further the Predetermined Protocol and support the statutory threshold for, and inflate the value of, the patients' BI and UM Claims.

### 3.    Rebein's Fraudulent Final Medical Examinations

208.    Like Bacaner and Torres-Ruiz, Rebein prepares Final Medical Examinations that contain physical examination findings, diagnoses, and conclusions that are not credible.

209.    Specifically, Rebein documents the overwhelming majority of patients end treatment with continued complaints of pain, often in their neck or back, or both, and suffer from some combination of non-specific tenderness, spasm, and/or guarding in the cervical and/or lumbar spinal regions.  (Ex. 10, cols. F-H, J; Ex. 40, p. 1, 3-4, 7, 9-10.)  Rebein's Final Medical Examinations rarely describe the specific area of the cervical or lumbar spinal regions, such as a particular vertebrae or area of paraspinal muscles, purportedly exhibiting tenderness, spasm, and/or guarding.  (Ex. 40, p. 1, 3-4, 7, 9-10.)  Rebein also documents the overwhelming majority of patients continue to have diminished

and/or painful range of motion in the cervical and lumbar spinal regions. (Ex. 10, cols. I, K; Ex. 40, p. 4, 10.)

210. Regardless of the patient's unique circumstances or purported examination results, Rebein, like Bacaner and Torres-Ruiz, purports to document nearly identical treatment conclusions for every patient. Despite the extensive treatment patients purportedly received during their course of care at the LaRocca Clinics, which often lasts months, Rebein concludes—often using the same phrase as Torres-Ruiz—that patients have sustained unresolved and permanent injuries as a result of their auto accident. (Ex. 10, col. L; Ex. 40, p. 6, 11.) The uniformity of such a serious finding across patients is not legitimate given many of the soft tissue injuries purportedly experienced by patients at the LaRocca Clinics heal without any intervention. Moreover, the uniformity of this finding is not credible across a wide and diverse patient population of varying conditions, limitations, and abilities. Additionally, like Torres-Ruiz, Rebein also concludes the patient's response to treatment has been limited with "recurring" symptoms, despite the fact the LaRocca Providers do not meaningfully modify treatments in response to a patient's lack of progress. (Ex. 10, col. M; Ex. 40, p. 6, 11.)

211. Rebein also recommends additional treatment for nearly every patient despite the litany of therapies already received at the LaRocca Clinics. (Ex. 10, col. N; Ex. 40, p. 5-6, 11.)

212. These patterns in purported findings and treatment conclusions are not credible given the wide variety of patients' preexisting conditions, medical histories, and symptoms. Instead, these uniform patterns show Rebein, like Bacaner and Torres-Ruiz, is not performing legitimate physical examinations, making legitimate diagnoses, and reaching legitimate conclusions or treatment recommendations tailored to each patient's unique needs, but rather is using predetermined findings and conclusions to give the illusion of severe conditions, diagnoses, and future medical needs of patients that further the Predetermined Protocol and support the statutory threshold for, and inflate the value of, the patients' BI and UM Claims.

## VI. BLAKE LAROCCA'S FUNDING COMPANY BENEFITS FROM THE PREDETERMINED PROTOCOL

213. On May 19, 2014, Blake LaRocca formed BTL Funding. BTL Funding is an active Florida Limited Liability Company. According to its 2021 Annual Report filed with the Florida Department of State, Blake LaRocca is the manager and resident agent of BTL Funding. Blake LaRocca is also the sole owner of BTL Funding. (Ex. 14, p. 8.)

214. Blake LaRocca formed BTL Funding to purchase accounts receivable from surgery centers. (*Id.* at p. 13.) In fact, Blake LaRocca uses BTL Funding to purchase accounts receivable for patients who treat at the LaRocca Clinics and undergo procedures at surgery centers performed by providers who appear to

have a referral relationship with Blake LaRocca.  Furthermore, a vice president of Surgery Partners LLC, a surgical center from which Blake LaRocca has purchased accounts receivable, testified Blake LaRocca and BTL Funding approached Surgery Partners and negotiated the price of the accounts receivable directly with Surgery Partners.  He also testified the majority of accounts receivable BTL Funding purchased from Surgery Partners were for procedures performed by one doctor.

215.   For example, patient L.T. began treating at the LaRocca Clinics on March 8, 2017.  (Ex. 1, Line 31.)  During the course of her treatment, L.T. was referred to a doctor who recommended she undergo a cervical epidural steroid injection.  On June 13, 2017, while L.T. was still receiving treatment at the LaRocca Clinics, the doctor performed a cervical epidural steroid injection at Dunedin Surgical Consultants, LLC, which charged $10,000 as its facility fee for the procedure.  According to a letter addressed to L.T.'s attorney and signed by Blake LaRocca on BTL Funding letterhead, Blake LaRocca, through BTL Funding, purchased the accounts receivable relating to Dunedin Surgical Consultants, LLC's facility fee for L.T.'s procedure.  (Ex. 41.)  The letter stated payment for Dunedin Surgical Consultants, LLC's facility fee "can be mailed to 3022 Oakmont DR Clearwater, FL 33761," which was Blake LaRocca's residence at the time.  (*Id.*) The letter also identified Blake LaRocca's phone number and email address in case

L.T.'s attorney had any questions regarding Dunedin Surgical Consultants, LLC's facility fee. (*Id.*)

216.    Blake LaRocca, through BTL Funding, also purchased the accounts receivable relating to patient R.D., who also treated at the LaRocca Clinics, was referred to the same doctor and another provider, and underwent procedures at Westchase Surgery Center, Ltd. ("Westchase"), which is a surgery center owned by Surgery Partners LLC. According to a letter addressed to R.D.'s attorney and signed by Blake LaRocca on BTL Funding letterhead, Blake LaRocca, through BTL Funding, purchased the accounts receivable relating to Westchase's facility fee, professional fees, and anesthesia fees for patient R.D.'s procedures. (Ex. 42.) Like the letter for L.T., this letter stated payment could be mailed to Blake LaRocca's residence (*i.e.*, 3022 Oakmont Dr., Clearwater, FL 33761). (*Id.*) The letter also listed Blake LaRocca's phone number and email address as contact information regarding R.D.'s bills. (*Id.*)

217.    Blake LaRocca also purchased the accounts receivable relating to patients A.M. and C.B. who treated at the LaRocca Clinics and underwent procedures at Westchase. On March 19, 2019, Blake LaRocca emailed the administrator of Westchase, asking her to change the description of the billing codes used for A.M.'s and C.B.'s procedures because "state farm is asking the attorney to correct way bill is[.]" (Ex. 43.) Blake LaRocca likely contacted the

administrator to correct the billing codes because he purchased Westchase's accounts receivable for A.M. and C.B. and wanted to ensure he could collect on the bills and make a profit.

218. Blake LaRocca has also purchased accounts receivable through another funding company, Greenway Funding L.L.C. ("Greenway"), for patients who treat at the LaRocca Clinics and undergo pain management procedures at surgery centers. In a deposition on January 6, 2020, a corporate representative of Dunedin Surgical Consultants, LLC, a surgery center, testified Blake LaRocca was her contact at Greenway and purchased the accounts receivable for a pain management procedure performed by a doctor for patient J.B., who treated at the LaRocca Clinics. In a later deposition on January 5, 2021, the same corporate representative testified Blake LaRocca, through Greenway, purchased the accounts receivable for a procedure performed by the same doctor for patient K.M. who treated at the LaRocca Clinics.

219. Blake LaRocca profits by purchasing accounts receivable at discounted rates and collecting on the bills at higher rates. As a result, by purchasing accounts receivable relating to patients who treat at the LaRocca Clinics where Blake LaRocca manages the day-to-day operations and is in charge of the billing, coding, and recordkeeping, Blake LaRocca has an incentive to implement—and does implement—the Predetermined Protocol to paper patients'

records at the LaRocca Clinics with continued complaints of pain and unresolved and permanent injuries that purportedly require additional treatment and referrals to pain management providers to perform procedures from which Blake LaRocca can profit.

## VII. DEFENDANTS VIOLATED FDUTPA

220. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." (Fla. Stat. § 501.204(1).) The provisions of FDUTPA are to be liberally construed to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts and practices in the conduct of any trade or commerce. (Fla. Stat. § 501.202(2).)

221. Violations of any law, statute, rule, or regulation which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices constitute violations of FDUTPA. (Fla. Stat. § 501.203(3)(c).) "A deceptive act or practice is 'one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *State Farm Mut. Auto. Ins. Co. v. First Care Sol., Inc.*, 232 F. Supp. 3d 1257, 1268 (S.D. Fla. 2017) (citation omitted). "Fraudulent conduct in the context of billing for PIP

benefits qualifies as a deceptive act for purposes of FDUTPA." *Id.* Similarly, "[t]he Insurance Fraud Statute may serve as a predicate offense under the FDUTPA."[z] *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1307 (S.D. Fla. 2018).

222.    Defendants violated FDUTPA by engaging in the unfair and deceptive acts and practices described throughout this Complaint, including intentionally and knowingly making, or causing to be made, false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire in submissions for services that were not lawfully rendered and were either not rendered at all or were not rendered because they were medically unnecessary. Defendants' conduct violates the established public policies of the state of Florida as codified in the PIP Law and Insurance Fraud Statute, and is immoral, unethical, oppressive, unscrupulous, misleading, and substantially injurious to consumers. Accordingly, the services purportedly provided by the LaRocca Clinics are not lawfully rendered and therefore are not compensable under Florida law.  (*See* Fla. Stat. §§ 627.732(11), 627.736(5)(b)(1)(b)-(c), and 817.234(1)(a)(2).)

---

[z] Pursuant to Fla. Stat. § 817.234(1)(a)(2) (the "Insurance Fraud Statute"), a person commits insurance fraud if that person, "with the intent to injure, defraud or deceive any insurer prepares or makes any written statement that is intended to be presented to any insurer in connection with, or support of, any claim for payment pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning the claim."  (Fla. Stat. § 817.234(1)(a)(2).)

## VIII.  STATE FARM MUTUAL AND STATE FARM FIRE'S RELIANCE

223.  Defendants are obligated legally and ethically to act honestly and with integrity.  Florida medical practice statutes govern the conduct of physicians and chiropractors who provide services in the state of Florida.  (*See, e.g.*, Fla. Stat. §§ 456.072, 458.331, and 460.413 (collectively, the "Disciplinary Statutes").) Pursuant to the Disciplinary Statutes, the following acts can result in disciplinary action against a physician and chiropractor:

(a)  Making misleading, deceptive, or fraudulent representations in or related to the practice of the licensee's profession;

(b)  Making deceptive, untrue, or fraudulent representations in or related to the practice of a profession; and

(c)  Exercising influence on the patient or client for the purpose of financial gain of the licensee or a third party.

(Fla. Stat. §§ 456.072(1)(a), (m), and (n), 458.331(1)(k) and (n), and 460.413(1)(k) and (n).)

224.  Moreover, the Insurance Fraud Statute imposes criminal penalties on individuals who "with the intent to injure, defraud or deceive any insurer prepares or makes any written statement that is intended to be presented to any insurer in connection with, or support of, any claim for payment pursuant to an insurance

policy, knowing that such statement contains any false, incomplete, or misleading information concerning the claim." (Fla. Stat. § 817.234(1)(a)(2).)

225.  Despite their duty to act honestly, with integrity, and in accord with Florida law, Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent because they represent patients were legitimately examined, had sustained EMCs, and received medically necessary and lawfully rendered services when, in fact, they did not.

226.  State Farm Mutual and State Farm Fire are under statutory and contractual duties to pay or deny claims for No-Fault Benefits within 30 days. Defendants' fraudulent scheme was successful because of precisely how State Farm Mutual and State Farm Fire are required to adjust claims for No-Fault Benefits.  State Farm Mutual and State Farm Fire must adjust each claim on its individual merits and within the 30-day time constraint imposed by Florida law.

227.  Defendants developed and implemented their fraudulent scheme to take advantage of State Farm Mutual and State Farm Fire, knowing the efficient operation of a system of insurance requires prompt processing of individual claims, and thus, Defendants' scheme would go undetected unless all of the bills and supporting documentation across the patients at issue in this Complaint were viewed together as a whole.

228.    The bills and supporting documents Defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire in support of the fraudulent and unlawful charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual and State Farm Fire to rely on them to their detriment.  As a result, State Farm Mutual and State Farm Fire have incurred damages of at least $2.1 million.

229.    Defendants made material misrepresentations and have taken other affirmative acts to conceal their fraud from State Farm Mutual and State Farm Fire. Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent and unlawful nature.  Only when Defendants' bills and supporting documentation across all patients at issue in this Complaint are viewed together as a whole do the patterns emerge revealing their fraudulent nature.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD
### (Against All Defendants)

230.    State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 229 above.

231.    In the claims set forth in Exhibit 1, Defendants acted in concert to intentionally and knowingly make, or cause to be made, false and fraudulent representations of material fact to State Farm Mutual and State Farm Fire.

232. Defendants' false and fraudulent representations of material fact include: (a) the services were performed, medically necessary, and lawful as required by the PIP Law, when they were not; (b) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (c) patients were legitimately diagnosed with injuries to their cervical, thoracic, and/or lumbar regions of the spine, when they were not; (d) patients were legitimately found to have sustained EMCs as a result of their auto accidents, when they were not; (e) patients received treatments consisting of the same or substantially similar combination of at least three passive modalities and vague therapeutic exercises at nearly every visit because such treatments were medically necessary, when they were not; (f) patients required medically necessary diagnostic imaging, including x-rays and DXD Studies at the LaRocca Clinics, when in fact such diagnostic imaging was not performed because it was medically necessary; (g) patients were legitimately found to suffer from permanent injuries at their final examinations, when they were not; and (h) the services performed at the LaRocca Clinics were lawfully rendered when, in fact, these services were not lawfully rendered and therefore were not owed pursuant to the PIP Law because such services were rendered pursuant to intentional violations of the PIP Law and Insurance Fraud Statute.

233.    Defendants knew the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatments, EMC findings, diagnostic imaging, and other services provided to patients were false and fraudulent when they were made.

234.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

235.    Representative examples of Defendants' fraudulent bills and supporting documentation can be found in Exhibits 16-40 and 44.

236.    As a result of their reliance on these misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $2.1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as the Court deems equitable, just, and proper.

### SECOND CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (Against All Defendants)

237.    State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 229 above.

238.    Defendants each knowingly agreed and conspired to conduct and participate, directly or indirectly, in the fraudulent scheme described above in

paragraphs 1 through 229 when they submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that were fraudulent and unlawful.

239. Defendants each agreed to act and did act in furtherance of the common and overall objective of the conspiracy to fraudulently obtain No-Fault Benefits by knowingly facilitating the submission of bills and supporting documentation to State Farm Mutual and State Farm Fire that made intentional false and fraudulent representations that: (a) the services were performed, medically necessary, and lawful as required by the PIP Law, when they were not; (b) patients were legitimately examined to determine the true nature and extent of their injuries, when they were not; (c) patients were legitimately diagnosed with injuries to their cervical, thoracic, and/or lumbar regions of the spine, when they were not; (d) patients were legitimately found to have sustained EMCs as a result of their auto accidents, when they were not; (e) patients received treatments consisting of the same or substantially similar combination of at least three passive modalities and vague therapeutic exercises at nearly every visit because such treatments were medically necessary, when they were not; (f) patients required medically necessary diagnostic imaging, including x-rays and DXD Studies at the LaRocca Clinics, when in fact such diagnostic imaging was not performed because it was medically necessary; (g) patients were legitimately found to suffer from

permanent injuries at their final examinations, when they were not; and (h) the services performed at the LaRocca Clinics were lawfully rendered when, in fact, these services were not lawfully rendered and therefore were not owed pursuant to the PIP Law because such services were rendered pursuant to intentional violations of the PIP Law and Insurance Fraud Statute.

240.    Defendants are jointly and severally liable to State Farm Mutual and State Farm Fire for the damages caused by their conspiracy.

241.    As a direct and proximate result of Defendants' conspiracy, State Farm Mutual and State Farm Fire have incurred damages of at least $2.1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants jointly and severally for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### THIRD CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against All Defendants)

242.    State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 229 above.

243.    In each claim described in Exhibit 1, State Farm Mutual and State Farm Fire conferred a benefit upon Defendants by paying their claims and these Defendants voluntarily accepted and have retained benefits from the payments conferred by State Farm Mutual and State Farm Fire.

244.     Because Defendants knowingly submitted, or caused to be submitted, charges for examinations, treatments, diagnostic imaging, and other services that were not medically necessary and lawfully rendered, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

245.     As a direct and proximate result of the above-described conduct, State Farm Mutual and State Farm Fire have been damaged and Defendants have been unjustly enriched by at least $2.1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants jointly and severally for compensatory damages, costs, and other such relief as the Court deems equitable, just, and proper.

## FOURTH CLAIM FOR RELIEF
## VIOLATIONS OF FDUTPA
### (Against All Defendants)

246.     State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 229 above.

247.     In each claim set forth in Exhibit 1 submitted to State Farm Mutual and State Farm Fire, Defendants engaged in unfair and deceptive acts and practices in the conduct of their trade and commerce.  Such acts and practices have offended public policy and were unconscionable, immoral, unethical, oppressive, and unscrupulous.  These acts and practices included intentionally and knowingly making, or causing to be made, false and fraudulent statements of material fact to

State Farm Mutual and State Farm Fire in submissions for services that were not lawfully rendered by the LaRocca Clinics because they were rendered pursuant to intentional violations of the PIP Law and Insurance Fraud Statute. (*See* Fla. Stat. §§ 627.732(11), 627.736(5)(b)(1)(b)-(c), and 817.234(1)(a)(2).) As a result of such acts and practices, Defendants have committed traditional and per se violations of FDUTPA.

248. Accordingly, by virtue of the foregoing, State Farm Mutual and State Farm Fire are entitled to compensatory damages of at least $2.1 million, plus their reasonable attorney's fees and costs, and any other relief this Court deems equitable, just, and proper.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages and reasonable attorney's fees, plus interest and costs, and any other relief this Court deems equitable, just, and proper.

**FIFTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(Against the LaRocca Clinics)**

249. State Farm Mutual and State Farm Fire incorporate as though fully set forth herein the allegations in paragraphs 1 through 229 above.

250. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

251. There is an actual case and controversy between State Farm Mutual and State Farm Fire, on one hand, and the LaRocca Clinics, on the other hand, as to all claims and charges for patients who purportedly received services performed at the LaRocca Clinics that have not been paid. State Farm Mutual and State Farm Fire contend the LaRocca Clinics are not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case.

252. Because the LaRocca Clinics knowingly made false and fraudulent statements relating to a claim and charge and otherwise engaged in the above-described fraudulent and unlawful conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim and charge the LaRocca Clinics submitted to State Farm Mutual and State Farm Fire, they are not entitled to any reimbursement for any unpaid claims and charges submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case. (*See* Fla. Stat. §§ 627.732(11), 627.736(5)(b)(1)(b)-(c), and 817.234(1)(a)(2).)

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring the LaRocca Clinics are not entitled to reimbursement for any of the unpaid charges for services purportedly performed at the LaRocca Clinics submitted to State Farm Mutual and State Farm Fire to date

and through the trial of this case, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury.

DATED October 29, 2021.  By:

_____/s/ Bart R. Valdes_____
BART R. VALDES
Florida Bar Number: 323380
bvaldes@dsklawgroup.com
AARON H. BAROFF
Florida Bar Number: 123743
abaroff@dsklawgroup.com
de Beaubien, Simmons, Knight,
Mantzaris & Neal, LLP
609 West Horatio Street
Tampa, Florida 33606
Telephone: (813) 251-5825
Facsimile: (813) 254-1063

- and –

ROSS O. SILVERMAN
ross.silverman@katten.com
(*pro hac vice to be filed*)
ERIC T. GORTNER
eric.gortner@katten.com
(*pro hac vice to be filed*)
MICHAEL J. POWERS
michael.powers@katten.com
(*pro hac vice to be filed*)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661-3693

Telephone: (312) 902-5200
Facsimile: (312) 902-1061

*Attorneys for Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*